*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 12a0386p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

Nos. 08-1387/1534

COALITION TO DEFEND AFFIRMATIVE
ACTION, INTEGRATION AND IMMIGRANT
RIGHTS AND FIGHT FOR EQUALITY BY ANY
MEANS NECESSARY (BAMN), et al.,
  *Plaintiffs-Appellants (08-1387)/Cross-*
                                    *Appellees,*

        *v.*

REGENTS OF THE UNIVERSITY OF MICHIGAN,
BOARD OF TRUSTEES OF MICHIGAN STATE
UNIVERSITY; BOARD OF GOVERNORS OF
WAYNE STATE UNIVERSITY; MARY SUE
COLEMAN; IRVIN D. REID; LOU ANNA K.
SIMON,
  *Defendants-Appellees/Cross-Appellants (08-*
*1534),*
BILL SCHUETTE, Michigan Attorney General,
        *Intervenor-Defendant-Appellee.*

Nos. 08-1387/1389/1534;
09-1111

No. 08-1389

COALITION TO DEFEND AFFIRMATIVE
ACTION, INTEGRATION AND IMMIGRANT
RIGHTS AND FIGHT FOR EQUALITY BY ANY
MEANS NECESSARY (BAMN), et al.,
                                    *Plaintiffs,*
CHASE CANTRELL, et al.,
                          *Plaintiffs-Appellees,*
        *v.*
REGENTS OF THE UNIVERSITY OF MICHIGAN,
BOARD OF TRUSTEES OF MICHIGAN STATE
UNIVERSITY; BOARD OF GOVERNORS OF
WAYNE STATE UNIVERSITY; MARY SUE
COLEMAN; IRVIN D. REID; LOU ANNA K.
SIMON,
                                  *Defendants,*
ERIC RUSSELL,
        *Intervenor-Defendant-Appellant,*
JENNIFER GRATZ,
        *Proposed Intervenor-Appellant.*

1

No. 09-1111
COALITION TO DEFEND AFFIRMATIVE
ACTION, INTEGRATION AND IMMIGRANT
RIGHTS AND FIGHT FOR EQUALITY BY ANY
MEANS NECESSARY (BAMN), et al.,
                                                      *Plaintiffs,*
CHASE CANTRELL, et al.,
                                                      *Plaintiffs-Appellants,*
          *v.*
REGENTS OF THE UNIVERSITY OF MICHIGAN,
BOARD OF TRUSTEES OF MICHIGAN STATE
UNIVERSITY; BOARD OF GOVERNORS OF
WAYNE STATE UNIVERSITY; MARY SUE
COLEMAN; IRVIN D. REID; LOU ANNA K.
SIMON,
                                                      *Defendants,*
BILL SCHUETTE, Michigan Attorney General,
                                *Intervenor-Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 06-15024—David M. Lawson, District Judge.

Argued: March 7, 2012

Decided and Filed:  November 15, 2012

Before:  BATCHELDER, Chief Judge; MARTIN, BOGGS, DAUGHTREY,
MOORE, COLE, CLAY, GIBBONS, ROGERS, SUTTON, COOK, GRIFFIN,
WHITE, STRANCH, and DONALD, Circuit Judges.[*]

        COLE, J., delivered the opinion of court in which MARTIN, DAUGHTREY,
MOORE, CLAY, WHITE, STRANCH, and DONALD, JJ., joined; and BATCHELDER,
C. J., and GIBBONS, ROGERS, SUTTON, COOK, and GRIFFIN, JJ., joined in Part
II.B and C.  BOGGS, J. (pp. 37–40), delivered a separate dissenting opinion, in which
BATCHELDER, C. J., joined.  GIBBONS (pp. 41–57), delivered a separate dissenting
opinion, in which BATCHELDER, C. J., and ROGERS, SUTTON, and COOK, JJ.,
joined, and GRIFFIN, J., joined with the exception of Part III.  ROGERS (pg. 58)
delivered a separate dissenting opinion, in which COOK, J., joined.  SUTTON (pp.
59–69), delivered a separate dissenting opinion in which BATCHELDER, C. J., and

_____

        [*] The Honorable David W. McKeague and the Honorable Raymond M. Kethledge, Circuit Judges,
did not participate in deciding this case.

BOGGS and COOK, JJ., joined.   GRIFFIN, J. (pp. 70–74), delivered a separate dissenting opinion.

_____

## COUNSEL

**ARGUED:** George Boyer Washington, SCHEFF, WASHINGTON & DRIVER, P.C., Detroit, Michigan, for Appellant/Cross-Appellee in 08-1387/1534.  John J. Bursch, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee in 08-1387/1534.  Leonard M. Niehoff, LEN NIEHOFF & ASSOCIATES, Chelsea, Michigan, Stephanie R. Setterington, VARNUM LLP, Grand Rapids, Michigan for Appellees/Cross-Appellants in 08-1387/1534.  Charles J. Cooper, COOPER & KIRK, PLLC, Washington, D.C., for Appellant in 08-1389.  Mark D. Rosenbaum, ACLU FOUNDATION OF SOUTHERN CALIFORNIA, Los Angeles, California, George Boyer Washington, SCHEFF, WASHINGTON & DRIVER, P.C., Detroit, Michigan, for Appellees in 08-1389.  Mark D. Rosenbaum, ACLU FOUNDATION OF SOUTHERN CALIFORNIA, Los Angeles, California, for Appellant in 09-1111.  John J. Bursch, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee in 09-1111.  **ON BRIEF:**  George Boyer Washington, Shanta Driver, SCHEFF, WASHINGTON & DRIVER, P.C., Detroit, Michigan, Winifred Kao, ASIAN LAW CAUCUS, San Francisco, California, for the Coalition Plaintiffs.  Mark D. Rosenbaum, ACLU FOUNDATION OF SOUTHERN CALIFORNIA, Los Angeles, California, Karin A. DeMasi, CRAVATH, SWAINE & MOORE LLP, New York, New York, for Cantrell Plaintiffs.  Michael E. Rosman, CENTER FOR INDIVIDUAL RIGHTS, Washington, D.C., Charles J. Cooper, David H. Thompson, COOPER & KIRK, PLLC, Washington, D.C., for Appellant in 08-1389.  Leonard M. Niehoff, HONIGMAN MILLER SCHWARTZ & COHN, LLP, Ann Arbor, Michigan, for the Universities Defendants.  John J. Bursch, Margaret A. Nelson, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Defendant Attorney General.  Stephanie R. Setterington, VARNUM LLP, Grand Rapids, Michigan, for Defendants Wayne State University and Irvin Reid.   Wilson R. Huhn, THE UNIVERSITY OF AKRON SCHOOL OF LAW, Akron, Ohio, Kenneth C. Yeager, DROCIAK, YEAGER & ASSOCIATES, Los Angeles, California, Daniel M. Levy, MICHIGAN DEPARTMENT OF CIVIL RIGHTS, Detroit, Michigan, Eugene Driker, BARRIS, SOTT, DENN, DRIKER, P.L.L.C., Detroit, Michigan, Catherine M. Mish, Kristen Rewa, CITY OF GRAND RAPIDS, CITY ATTORNEY'S OFFICE, Grand Rapids, Michigan, Doyle O'Connor, Detroit, Michigan, Allison S. Elgart, EQUAL JUSTICE SOCIETY, San Francisco, California, G. Scott Emblidge, MOSCONE EMBLIDGE & SATER LLP, San Francisco, California, Derek T. Ho, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., Barry Levenstam, JENNER & BLOCK LLP, Chicago, Illinois, Michael Francis Smith, THE SMITH APPELLATE LAW FIRM, Washington, D.C., Sharon L. Browne, PACIFIC LEGAL FOUNDATION, Sacramento, California, for Amici Curiae.

———————————

**OPINION**

———————————

COLE, Circuit Judge.  A student seeking to have her family's alumni connections considered in her application to one of Michigan's esteemed public universities could do one of four things to have the school adopt a legacy-conscious admissions policy: she could lobby the admissions committee, she could petition the leadership of the university, she could seek to influence the school's governing board, or, as a measure of last resort, she could initiate a statewide campaign to alter the state's constitution.  The same cannot be said for a black student seeking the adoption of a constitutionally permissible race-conscious admissions policy.  That student could do only one thing to effect change: she could attempt to amend the Michigan Constitution—a lengthy, expensive, and arduous process—to repeal the consequences of Proposal 2.  The existence of such a comparative structural burden undermines the Equal Protection Clause's guarantee that all citizens ought to have equal access to the tools of political change.  We therefore REVERSE the judgment of the district court on this issue and find Proposal 2 unconstitutional.  We AFFIRM the denial of the University Defendants' motion to be dismissed as parties, and we AFFIRM the grant of the Cantrell Plaintiffs' motion for summary judgment as to Russell.

I.

*A. Factual Background*

These appeals are before us as an epilogue to the long-running battle over the use of race-conscious admissions policies at Michigan's public colleges and universities. The saga began during the 1960s and 1970s, when racial minorities first successfully lobbied for the adoption of such policies.  They remained largely in place until challenges in the late 1990s culminated in the Supreme Court's decisions in *Gratz v. Bollinger*, 539 U.S. 244 (2003), and *Grutter v. Bollinger*, 539 U.S. 306 (2003), which

held that "universities cannot establish quotas for members of certain racial groups" or treat their applications uniquely. *Grutter*, 539 U.S. at 334. But the Court allowed universities to continue "consider[ing] race or ethnicity more flexibly as a 'plus' factor in the context of individualized consideration," along with other relevant factors, *id.*, a holding we do not today address or upset.

Following these decisions, Ward Connerly, a former University of California Regent who had championed a similar proposition in California, and Jennifer Gratz, the lead plaintiff in *Gratz*, mobilized to place on Michigan's November 2006 statewide ballot a proposal to amend the Michigan Constitution "to prohibit all sex- and race-based preferences in public education, public employment, and public contracting . . . ." *Operation King's Dream v. Connerly*, 501 F.3d 584, 586 (6th Cir. 2007). The initiative—officially designated Proposal 06-2 but commonly known as "Proposal 2"—sought "to amend the State Constitution to ban affirmative action programs." *See* Notice of State Proposals for November 7, 2006 General Election, http://www.michigan.gov/documents/sos/ED-138_State_Prop_11-06_174276_7.pdf, at 5 (last visited May 22, 2012). Though Proposal 2 "found its way on the ballot through methods that undermine[d] the integrity and fairness of our democratic processes," *Operation King's Dream*, 501 F.3d at 591, once there, it garnered enough support among Michigan voters to pass by a margin of 58% to 42%.

Proposal 2 amended the Michigan Constitution to include the following provisions, entitled "Affirmative action," in Article I:

> (1) The University of Michigan, Michigan State University, Wayne State University, and any other public college or university, community college, or school district shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.
>
> (2) The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.

(3) For the purposes of this section "state" includes, but is not necessarily limited to, the state itself, any city, county, any public college, university, or community college, school district, or other political subdivision or governmental instrumentality of or within the State of Michigan not included in sub-section 1.

Mich. Const. art. I, § 26.  Proposal 2 took effect in December 2006 and wrought two significant changes to the admissions policies at Michigan's public colleges and universities.  First, it eliminated the consideration of "race, sex, color, ethnicity, or national origin" in individualized admissions decisions, modifying policies in place for nearly a half-century.  No other admissions criterion—for example, grades, athletic ability, geographic diversity, or family alumni connections—suffered the same fate. Second, Proposal 2 entrenched this prohibition at the state constitutional level, thus preventing public colleges and universities or their boards from revisiting this issue—and only this issue—without repeal or modification of article I, section 26 of the Michigan Constitution.

*B. Procedural History*

The litigation surrounding Proposal 2 has been lengthy and complex.  On November 8, 2006, the day after Proposal 2 passed, a collection of interest groups and individuals, including the Coalition to Defend Affirmative Action, Integration and Immigration Rights and Fight for Equality By Any Means Necessary ("Coalition Plaintiffs"), filed suit in the United States District Court for the Eastern District of Michigan.  They named as defendants then-Governor Jennifer Granholm, the Regents of the University of Michigan, the Board of Trustees of Michigan State University, and the Board of Governors of Wayne State University ("University Defendants"), and alleged that the provisions of Proposal 2 affecting public colleges and universities violated the United States Constitution and federal statutory law.  The Coalition Plaintiffs limited their request for relief to Proposal 2 as it applies to public education, and did not challenge its constitutionality as it applies to public employment or public contracting.  About a month later, the Michigan Attorney General ("Attorney General") filed a motion to intervene as a defendant, which the district court granted.  Shortly

thereafter, Eric Russell, then an applicant to the University of Michigan Law School, and Toward A Fair Michigan ("TAFM"), a non-profit corporation formed to ensure implementation of Proposal 2, also filed a motion to intervene in the litigation.

On December 19, 2006, a group of faculty members and prospective and current students at the University of Michigan ("Cantrell Plaintiffs") filed a separate but similar suit in the United States District Court for the Eastern District of Michigan against Granholm. This lawsuit also limited its challenge to Proposal 2 as it applies to public education.

That same day, the district court issued what was, in effect, a preliminary injunction, postponing the application of Proposal 2 to the universities' admissions and financial-aid policies until July 1, 2007, which was the conclusion of the 2006-2007 admissions and financial-aid cycle. The district court's order stemmed from a stipulation among the University Defendants, Coalition Plaintiffs, Granholm, and the Attorney General consenting to the injunction. *Coal. to Defend Affirmative Action v. Granholm* (*Coal. I*), No. 06-15024, 2006 WL 3953321 (E.D. Mich. Dec. 19, 2006). While awaiting approval as intervenors, Russell and TAFM opposed the Attorney General's stipulation and sought a stay of the injunction from the district court. When two days passed without a ruling on their motions, Russell and TAFM filed with us an "Emergency Motion for a Stay Pending Appeal," which we granted. *Coal. to Defend Affirmative Action v. Granholm* (*Coal. II*), 473 F.3d 237, 253 (6th Cir. 2006), *application to vacate stay denied*, 549 U.S. 1176 (2007). Meanwhile, we approved the district court's decision to allow only Russell to intervene in the Proposal 2 litigation. *Coal. to Defend Affirmative Action v. Granholm* (*Coal. III*), 501 F.3d 775 (6th Cir. 2007).

On October 5, 2007, the Cantrell Plaintiffs filed a motion for summary judgment as to Russell, arguing that he should be dismissed from the litigation because he no longer represented an interest distinct from that of the Attorney General. On October 17, 2007, the University Defendants filed a motion to dismiss on the ground that they were not necessary parties to the litigation. On November 30, 2007, the Attorney General

filed a motion to dismiss for lack of standing or, in the alternative, a motion for summary judgment on the merits as to all Plaintiffs. Russell and the Cantrell Plaintiffs likewise filed motions for summary judgment the same day.

On March 18, 2008, the district court issued two orders addressing these motions. First, the court denied the University Defendants' request to be dismissed as parties and the Cantrell Plaintiffs' motion for summary judgment. *Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich.* (*Coal. IV*), 539 F. Supp. 2d 924, 941, 950-58 (E.D. Mich. 2008). The court also granted the Attorney General's motion for summary judgment, rejecting the Plaintiffs' arguments that Proposal 2 violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 960. Second, the court granted the Cantrell Plaintiffs' motion for summary judgment, dismissing Russell as an intervenor. *Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich.* (*Coal. V*), 539 F. Supp. 2d 960 (E.D. Mich. 2008). The Cantrell Plaintiffs subsequently moved the court to reconsider the first order, but the court denied the motion. *Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich.* (*Coal. VI*), 592 F. Supp. 2d 948 (E.D. Mich. 2008).

The Plaintiffs, the University Defendants, and Russell appealed these orders to this Court. A panel of this Court reversed the district court's grant of summary judgment in favor of the Attorney General, concluding that the portions of Proposal 2 that affect Michigan's public institutions of higher education impermissibly alter the political process in violation of the Equal Protection Clause. *Coal. to Defend Affirmative Action v. Regents of the Univ. of Mich.* (*Coal. VII*), 652 F.3d 607, 631-32 (6th Cir. 2011). This Court also affirmed the district court's dismissal of Russell and the denial of the University Defendants' motion to be dismissed. The Attorney General then sought en banc review, which we granted, vacating the panel opinion.

II.

*A. Constitutionality of Proposal 2*

The Equal Protection Clause provides that "[n]o state shall . . . deny to any person . . . the equal protection of the laws." U.S. Const. amend. XIV. The Plaintiffs argue that Proposal 2 violates this provision in two distinct ways. Both Plaintiff groups argue that Proposal 2 violates the Equal Protection Clause by impermissibly restructuring the political process along racial lines (the "political process" argument), and the Coalition Plaintiffs additionally argue that Proposal 2 violates the Equal Protection Clause by impermissibly classifying individuals on the basis of race (the "traditional" argument).

In addressing the Plaintiffs' arguments, we are neither required nor inclined to weigh in on the constitutional status or relative merits of race-conscious admissions policies as such. This case does not present us with a second bite at *Gratz* and *Grutter*—despite the best efforts of the dissenters to take one anyway. This case instead presents us with a challenge to the constitutionality of a state amendment that alters the process by which supporters of permissible race-conscious admissions policies may seek to enact those policies. In other words, the sole issue before us is whether Proposal 2 runs afoul of the constitutional guarantee of equal protection by removing the power of university officials to even *consider* using race as a factor in admissions decisions—something they are specifically allowed to do under *Grutter*.

We review de novo a district court's grant of summary judgment and denial of a motion for reconsideration of that decision. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009); *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1047 (6th Cir. 2001). Whether a state's constitution violates the federal constitution is a question of law, which we also review de novo. *Cherry Hill Vineyards, LLC v. Lilly*, 553 F.3d 423, 431 (6th Cir. 2008).

*1. Equal Protection Within the Political Process*

The Equal Protection Clause "guarantees racial minorities the right to full participation in the political life of the community. It is beyond dispute . . . that given racial or ethnic groups may not be denied the franchise, or precluded from entering into the political process in a reliable and meaningful manner." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 467 (1982). But the Equal Protection Clause reaches even further, prohibiting "a political structure that treats all individuals as equals, yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation." *Id.* (internal quotation marks and citation omitted). "[T]he State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size." *Hunter v. Erickson*, 393 U.S. 385, 393 (1969).

The Supreme Court's statements in *Hunter* and *Seattle* emphasize that equal protection of the laws is more than a guarantee of equal treatment under existing law. It is also a guarantee that minority groups may meaningfully participate in the process of creating these laws and the majority may not manipulate the channels of change so as to place unique burdens on issues of importance to them. In effect, the political-process doctrine hews to the unremarkable notion that when two competitors are running a race, one may not require the other to run twice as far or to scale obstacles not present in the first runner's course. Ensuring the fairness of the political process is particularly important because an electoral minority is disadvantaged by definition in its attempts to pass legislation; this is especially true of "discrete and insular minorities," who face unique additional hurdles. *Cf. United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938).

Ensuring a fair political process is nowhere more important than in education. Education is the bedrock of equal opportunity and "the very foundation of good citizenship." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). Safeguarding the

guarantee "that public institutions are open and available to all segments of American society, including people of all races and ethnicities, represents a paramount government objective." *Grutter*, 539 U.S. at 331-32 (internal quotation marks omitted). Moreover, universities "represent the training ground for a large number of our Nation's leaders. . . . [T]o cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity." *Id.* at 332 (citation omitted). Therefore, in the high-stakes context of education, we must apply the political-process doctrine with the utmost rigor.

Of course, the Constitution does not protect minorities from political defeat: Politics necessarily produces winners and losers. We must therefore have some way to differentiate between the constitutional and the impermissible. And *Hunter* and *Seattle* provide just that. They set the benchmark for when the majority has not only won, but has rigged the game to reproduce its success indefinitely.

> *a.* Hunter v. Erickson

In *Hunter*, the citizens of Akron, Ohio, overturned a fair housing ordinance enacted by the City Council. 393 U.S. at 386. But the citizens did more than merely repeal the ordinance; they amended the city charter through a referendum to require the approval of an electoral majority before any ordinance regulating real estate "on the basis of race, color, religion, national origin or ancestry"—past or future—could take effect. *Id.* at 387, 390 n.6. In other words, only ordinances based on those factors required a city-wide majority; ordinances based on any other factor required just a vote by the City Council:

> [T]he amendment changed the requirements for the adoption of one type of local legislation: to enact an ordinance barring housing discrimination on the basis of race or religion, proponents had to obtain the approval of the City Council *and* of a majority of the voters citywide. To enact an ordinance preventing housing discrimination on other grounds, or to enact any other type of housing ordinance, proponents needed the support of only the City Council.

*Seattle*, 458 U.S. at 468 (describing *Hunter*). The referendum halted operation of the existing fair housing ordinance, and more importantly for our purposes, erected a barrier to any similar ordinance in the future. *Hunter*, 393 U.S. at 389-90.

The Supreme Court found that the disparity between the process for enacting a future fair housing ordinance and the process for enacting any other housing ordinance "place[d] special burden[s] on racial minorities within the governmental process" by making it "substantially more difficult to secure enactment" of legislation that would be to their benefit. *Id.* at 390-91. While the enactment "treat[ed] Negro and white, Jew and gentile in an identical manner," the Court found that "the reality is that the law's impact falls on the minority." *Id.* at 391. That the law had been enacted via a popular referendum did not save it from working "a real, substantial, and invidious denial of the equal protection of the laws." *Id.* at 393.

### *b.* Washington v. Seattle School District No. 1

In *Seattle*, a case that mirrors the one before us, the Supreme Court applied *Hunter* to strike down a state statute, also enacted via a referendum, that prohibited racially integrative busing. *Seattle*, 458 U.S. at 463. Prior to the referendum, Seattle School District No. 1 ("District") had implemented a school desegregation plan that made extensive use of mandatory reassignments. *Id.* at 460-61. The District was under no obligation to adopt this plan: following *Brown*, school boards had been "charged with the affirmative duty to take whatever steps might be necessary" to integrate schools that were unconstitutionally segregated because of racial discrimination, *Green v. Cnty. Sch. Bd.*, 391 U.S. 430, 437 (1968), but there had been no finding that the *de facto* segregation in Seattle's schools was the product of discrimination. Nonetheless, the school board implemented the plan to accelerate its existing program of voluntary

busing, which some constituencies saw as insufficiently alleviating racial imbalances.[1] *Seattle*, 458 U.S. at 460.

In response, Seattle residents drafted a statewide measure—known as Initiative 350—providing in relevant part that "no school board . . . shall directly or indirectly require any student to attend a school other than the school which is geographically nearest or next nearest the student's place of residence . . . ." *Id.* at 462 (alteration in original) (quoting Wash. Rev. Code § 28A.26.010 (1981)). Though the initiative was framed as a general ban on mandatory busing, its myriad exceptions made its real effect the elimination of school reassignments for racial purposes only, except where a court ordered such reassignments to remedy unconstitutional segregation. *Id.* at 462-63. Initiative 350 made it on the Washington ballot and passed by a substantial margin. *Id.* at 463.

The Court found that Initiative 350, like the Akron city charter amendment, violated the Equal Protection Clause. *Id.* at 487. The Court stated that its prior cases yielded a "simple but central principle": while "laws structuring political institutions or allocating political power according to neutral principles" do not violate the Fourteenth Amendment, "a different analysis is required when the State allocates governmental power nonneutrally, by explicitly using the *racial* nature of a decision to determine the decisionmaking process." *Seattle*, 458 U.S. at 469-70. Echoing *Hunter*, the Court explained that this distinct analysis is necessary because non-neutral allocations of power "place[] *special* burdens on racial minorities within the governmental process, thereby making it *more* difficult for certain racial and religious minorities than for other members of the community to achieve legislation that is in their interest." *Id.* at 470 (internal quotation marks, citations, and brackets omitted). The Court dismissed the

---

[1] It bears repeating that the school board took this step in the absence of a court order or any unconstitutional discrimination whatsoever. The voluntary plan was an ameliorative measure intended to benefit minority students; it was not a protective measure intended to shield minority students from *de jure* discrimination, which no court had found to exist. *See Seattle*, 458 U.S. at 460-61; *see also infra* Part II.A.3.

argument that Initiative 350 was not intended to prevent busing for racially-integrative purposes, and explained why Initiative 350 violated this "simple but central" principle.

As a threshold matter, the Court concluded that the busing program, like the fair housing ordinance in *Hunter*, "at bottom inures primarily to the benefit of the minority, and is designed for that purpose." *Id.* at 472.  The Court reasoned that while "white as well as Negro children benefit from exposure to ethnic and racial diversity in the classroom," desegregation primarily benefits minority children because these children "can achieve their full measure of success only if they learn to function in—and are fully accepted by—the larger community.  Attending an ethnically diverse school may help accomplish this goal by preparing minority children for citizenship in our pluralistic society."  *Id.* at 472-73 (internal quotation marks omitted).  Because racial minorities had reason to "consider busing for integration to be 'legislation that is in their interest,'" the "racial focus of Initiative 350 . . . suffice[d] to trigger application of the *Hunter* doctrine."  *Id.* at 474 (quoting *Hunter*, 393 U.S. at 395 (Harlan, J., concurring)).

Having concluded that Initiative 350 targeted a busing program that "inures primarily to the benefit of the minority," the Court held that "the practical effect of Initiative 350 is to work a reallocation of power of the kind condemned in *Hunter*."  *Id.* As the Court explained, Initiative 350 did more than merely repeal the busing program:

> The initiative removes the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests.  Those favoring the elimination of *de facto* school segregation now must seek relief from the state legislature, or from the statewide electorate.  Yet authority over all other student assignment decisions, as well as over most other areas of educational policy, remains vested in the local school board. . . .  As in *Hunter*, then, the community's political mechanisms are modified to place effective decisionmaking authority over a racial issue at a different level of government.

*Id.*  By removing authority over busing for racial purposes from the school board and placing it at a more remote level of government, Initiative 350 required "those championing school integration to surmount a considerably higher hurdle than persons

seeking comparable legislative action," and disadvantaged "those who would benefit from laws barring *de facto* desegregation as against those who . . . would otherwise regulate student assignment decisions." *Id.* at 474-75 (alteration in original) (internal quotation marks omitted). Accordingly, the Court held that Initiative 350 violated the Equal Protection Clause. *Id.* at 470.

In sum, *Hunter* and *Seattle* require us to examine an enactment that changes the governmental decisionmaking process for legislation with a racial focus to determine if it improperly manipulates the channels for change.[2] *Seattle*, 458 U.S. at 470, 485; *Hunter*, 393 U.S. at 391; *cf. Carolene Prods.*, 304 U.S. at 152 n.4 (noting that more exacting judicial scrutiny is required when the majority curtails "the operation of those political processes ordinarily to be relied upon to protect minorities"). To the extent that it does, we must strike down the enactment absent a compelling state interest.

### 2. *Application of the* Hunter/Seattle *Test to Proposal 2*

*Hunter* and *Seattle* thus expounded the rule that an enactment deprives minority groups of the equal protection of the laws when it: (1) has a racial focus, targeting a policy or program that "inures primarily to the benefit of the minority"; and (2) reallocates political power or reorders the decisionmaking process in a way that places special burdens on a minority group's ability to achieve its goals through that process. *See Seattle*, 458 U.S. at 467, 472; *Hunter*, 393 U.S. at 391. Applying this rule here, we conclude that Proposal 2 targets a program that "inures primarily to the benefit of the minority" and reorders the political process in Michigan in a way that places special burdens on racial minorities.

---

[2]This holds true for enactments that make it more difficult for minorities to use the political process to obtain *any* sort of legislation that is in their interest—notwithstanding whether one characterizes such legislation as seeking protection against discrimination or, alternatively, preferential treatment. *See infra* Part II.A.3.

### a. Racial Focus

The first prong of the *Hunter*/*Seattle* test requires us to determine whether Proposal 2 has a "racial focus." *Seattle*, 458 U.S. at 474. This inquiry turns on whether the targeted policy or program, here holistic race-conscious admissions policies at public colleges and universities, "at bottom inures primarily to the benefit of the minority, and is designed for that purpose." *Id.* at 472. The targeted policy need not be for the sole benefit of minorities, for "it is enough that minorities may consider [the now burdened policy] to be 'legislation that is in their interest.'" *Id.* at 474 (quoting *Hunter*, 393 U.S. at 395 (Harlan, J., concurring)).[3]

*Seattle* conclusively answers whether a law targeting policies that seek to facilitate classroom diversity, as Proposal 2 does, has a racial focus. In *Seattle*, the Court observed that programs intended to promote school diversity and further the education of minority children enable these students to "achieve their full measure of success." *Id.* at 472-73. Such programs do so through "preparing minority children for citizenship in our pluralistic society, while . . . teaching members of the racial majority to live in harmony and mutual respect with children of minority heritage." *Id.* at 473 (internal quotation marks and citation omitted). Accordingly, the Court noted that "desegregation of the public schools . . . at bottom inures primarily to the benefit of the minority . . . ." *Id.* at 472. Because minorities could "consider busing for integration to be 'legislation that is in their interest,'" the Court concluded that Initiative 350's effective repeal of such programs had a racial focus sufficient to "trigger application of the *Hunter* doctrine." *Id.* at 474.

---

[3]The Attorney General contends that *Hunter* and *Seattle* not only require that the targeted legislation has a racial focus, but that the new legislation be enacted with discriminatory intent. This requirement has no basis in law. To the contrary, the Supreme Court has explicitly rejected such an argument. *See Seattle*, 458 U.S. at 485 ("We have not insisted on a particularized inquiry into motivation in all equal protection cases: 'A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification.' And legislation of the kind challenged in *Hunter* similarly falls into an inherently suspect category.") (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979)).

The logic of the Court's decision in *Seattle* applies with equal force here. Proposal 2 targets race-conscious admissions policies that "promote[] 'cross-racial understanding,' help[] to break down racial stereotypes, and 'enable[] students to better understand persons of different races.'" *Grutter*, 539 U.S. at 330 (alteration omitted) (internal quotation marks and citation omitted). Just as an integrative busing program is designed to improve racial minorities' representation at certain public schools, *see Seattle*, 458 U.S. at 461, race-conscious admissions policies are designed to increase racial minorities' representation at institutions of higher education, *see, e.g.*, *Grutter*, 539 U.S. at 316, 328-33; *Gratz*, 539 U.S. at 253-56. There is no material difference between the enactment in *Seattle* and Proposal 2, as both targeted policies that benefit minorities by enhancing their educational opportunities and promoting classroom diversity. Further, given that racial minorities lobbied for the implementation of the very policies that Proposal 2 permanently eliminates, it is beyond question that Proposal 2 targets policies that "minorities may consider . . . [to be] in their interest." *Seattle*, 458 U.S. at 474. Therefore, Proposal 2 has a racial focus because race-conscious admissions policies at Michigan's public colleges and universities "inure[] primarily to the benefit of the minority, and [are] designed for that purpose." *Id.* at 472.

*Seattle* not only mandates our conclusion that Proposal 2 is racially focused, but it also dispels any notion that the benefit race-conscious admissions policies may confer on the majority undercuts its "racial focus." Although it is true that increased representation of racial minorities in higher education benefits all students, *see Grutter*, 539 U.S. at 327-33; *Seattle*, 458 U.S. at 472-73, the Supreme Court has made clear that these policies still have a racial focus. In *Seattle*, the Court recognized that it is "clear that white as well as Negro children benefit from exposure to ethnic and racial diversity in the classroom." *Seattle*, 458 U.S. at 472 (internal quotation marks omitted). But the *Seattle* Court found that the wider benefits of the busing plan did not serve to distinguish *Hunter*, "for we may fairly assume that members of the racial majority both favored and benefited from Akron's fair housing ordinance." *Id.* By the same token, the wider

benefits of race-conscious admissions policies do not undermine the conclusion that such admissions policies "inure[] primarily to the benefit of the minority . . . ." *Id.*

Nor do policy arguments attacking the wisdom of race-conscious admissions programs preclude our finding that these programs "inure[] primarily to the benefit of the minority." *Id.* Critics of affirmative action maintain that race-conscious admissions policies actually harm minorities by stigmatizing minority students admitted into high-caliber institutions through a perception that they lack sufficient qualifications; by impeding the academic success of minority students admitted to institutions they are not qualified to attend; and by impairing the admissions prospects of traditionally higher-performing minority groups, such as Asian-Americans. But the controversy surrounding the policies that Proposal 2 targets is irrelevant as to whether Proposal 2 itself has a racial focus; rather, this controversy is a "matter[] to be resolved through the political process." *Id.* at 474 ("It is undeniable that busing for integration . . . engenders considerably more controversy than does the sort of fair housing ordinance debated in *Hunter*. But in the absence of a constitutional violation, the desirability and efficacy of school desegregation are matters to be resolved through the political process."). As in *Seattle*, "it is enough that minorities may consider [the repealed policy] to be 'legislation that is in their interest.'" *Id.* (quoting *Hunter*, 393 U.S. at 395 (Harlan, J., concurring)).

We find that the holistic race-conscious admissions policies now barred by Proposal 2 inure primarily to the benefit of racial minorities, and that such groups consider these policies to be in their interest. Indeed, we need not look further than the approved ballot language—characterizing Proposal 2 as an amendment "to ban affirmative action programs"—to confirm that this legislation targets race-conscious admissions policies and, insofar as it prohibits consideration of applicants' race in admissions decisions, that it has a racial focus.[4]

---

[4] It is of no consequence that Proposal 2, by its terms, purports to also prohibit preferences based on sex, color, ethnicity, and national origin. As the primary dissent concedes in a self-defeating footnote, the challenged amendment in *Hunter* also extended beyond race—covering color, religion, national origin, and ancestry as well. Here, as in *Hunter*, the clear focus of the challenged amendment is race. The history of Proposal 2 and its description on the ballot leave little doubt. Moreover, allowing drafters of racially-focused legislation to evade the protections of the Fourteenth Amendment by nominally including more

### b. A Reordering of the Political Process That Burdens Racial Minorities

The second prong of the *Hunter/Seattle* test asks us to determine whether Proposal 2 reallocates political power or reorders the political process in a way that places special burdens on racial minorities. *See Seattle*, 458 U.S. at 467; *Hunter*, 393 U.S. at 391. We must first resolve (1) whether the affected admissions procedures lie within the "political process," and then (2) whether Proposal 2 works a "reordering" of this political process in a way that imposes "special burdens" on racial minorities.

### i. Proposal 2's Effect on a "Political Process"

The breadth of Proposal 2's influence on a "political process" turns on the role the popularly elected governing boards of the universities play in setting admissions procedures. The key question is whether the boards had the power to alter the universities' admissions policies prior to the enactment of Proposal 2. If the boards had that power and could influence the use (or non-use) of race-conscious admissions policies, then Proposal 2's stripping of that power works a reordering of the political process because minorities can no longer seek to enact a type of legislation that is in their interest at the board level. But if board members lacked such power, because policy decisions are actually under the control of politically unaccountable faculty members or admissions committees, then Proposal 2's effect on the political process is negligible.

This issue—whether the admissions policies affected by Proposal 2 are part of a "political process"—was the subject of stark disagreement between the majority and the dissent when this case was originally before a three-judge panel, and it continues to be here. In supplemental briefing, the University Defendants clarified their admissions practices, undercutting the factual and legal basis of the panel dissent's core contention that Proposal 2 falls outside the political process. We  examine the administrative

---

than one class of individuals would seem to elevate form at the expense of substance.

structure of Michigan's public universities and their admissions processes in light of this new information, even though the dissenters choose to look the other way.

The Michigan Constitution establishes three public universities—the University of Michigan, Michigan State University, and Wayne State University—and grants control of each to a governing board.[5] Mich. Const. art. VIII, § 5; *see also id.* § 6 (allowing the establishment of other institutions of higher learning, such as Michigan's other public colleges and universities, and affording their governing boards similar control). These boards have the same role: to run, with plenary authority, their respective institutions. *Id.* art. VIII, §§ 5-6; *Glass v. Dudley Paper Co.*, 112 N.W.2d 489, 490 (Mich. 1961). Michigan law has consistently confirmed this absolute authority. *See, e.g.*, *Glass*, 112 N.W.2d at 490; *Att'y Gen. ex rel. Cook v. Burhans*, 7 N.W.2d 370, 371 (Mich. 1942); *Bd. of Regents of Univ. of Mich. v. Auditor Gen.*, 132 N.W. 1037, 1040 (Mich. 1911); 1979-80 Mich. Op. Att'y Gen. 578, 1980 WL 114008, at *1-2 (Mich. A.G. Jan. 31, 1980). Indeed, the boards are described as "the highest form of juristic person known to the law, a constitutional corporation of independent authority, which, within the scope of its functions, is co-ordinate with and equal to that of the legislature." *Federated Publ'ns, Inc. v. Bd. of Trs. of Mich. State Univ.*, 594 N.W.2d 491, 496 n.8 (Mich. 1999) (quoting *Bd. of Regents of the Univ. of Mich. v. Auditor Gen.*, 132 N.W. 1037, 1040 (Mich. 1911)).

Eight popularly elected individuals sit on these boards, and they hold office for eight years. Mich. Const. art. VIII, § 5; *see also id.* § 6. The boards have the "power to enact ordinances, by-laws and regulations for the government of the university." Mich. Comp. Laws § 390.5; *see also id.* §§ 390.3-.6.[6] Exercising this power, the boards have

---

[5]At each institution, these boards and their members have slightly differing names—for example, "Board of Trustees," "Board of Governors," or "Board of Regents." Mich. Const. art. VIII, § 5.

[6]Though the statutes and bylaws cited in this paragraph govern only the University of Michigan, the boards of the other public colleges and universities in Michigan are similarly empowered. *See, e.g.*, Mich. Comp. Laws §§ 390.102-.107 (Michigan State University), 390.641-.645 (Wayne State University). For the sake of clarity, we refer exclusively to the University of Michigan's bylaws and procedures, as they very closely parallel those in place at other Michigan public educational institutions, such as Wayne State University and Michigan State University.

enacted bylaws—which they have complete authority to revise or revoke—detailing admissions procedures. *See* Univ. of Mich., Bylaws of the Bd. of Regents § 8.01, *available at* http://www.regents.umich.edu/bylaws (last visited May 22, 2012) [hereinafter Univ. of Mich. Bylaws]; Mich. State Univ., Bd. of Trs. Bylaws, art. 4, *available at* http://www.trustees.msu.edu/bylaws (last visited May 22, 2012); Wayne State Univ. Statutes §§ 2.34.09, 2.34.12, *available at* http://www.bog.wayne.edu/code (last visited May 22, 2012).

The University of Michigan's bylaws delegate the day-to-day management of undergraduate admissions to the associate vice provost and executive director of undergraduate admissions. *See* Univ. of Mich. Bylaws § 8.01. Although the board delegates this responsibility, it continues to exercise ultimate decisionmaking authority because it directly appoints the associate vice provost and executive director of undergraduate admissions, *id.*, and because it retains the power to revoke or alter the admissions framework, *id.* §§ 14.03, 14.04. Nothing prevents the board from adopting an entirely new framework for admissions decisions if it is so inclined. *See* Mich. Const. art. VIII, § 5; Mich. Comp. Laws §§ 390.3-.6; Univ. of Mich. Bylaws § 8.01. Indeed, that the board can revise its bylaws is not a mere theoretical possibility, but a reality that occurs with some frequency. Since 2008, the University of Michigan's Board of Regents has revised more than two dozen of its bylaws, two of which fall within Chapter VIII, the section regulating admissions practices.

Of course power in a large university, a vast and highly complex institution, must be delegated. As such, the board fulfills its general supervisory role by conducting monthly public meetings to remain apprised of all university operations and by exercising its power to amend bylaws or revise delegations of responsibility. *See* Univ. of Mich. Bylaws §§ 1.01, 14.03. At these meetings, the board regularly discusses admissions practices, including the use of race-conscious admissions policies. *See*, *e.g.*, Univ. of Mich. Bd. of Regents Proceedings, March 2007, 264-65 (report of Provost to Board of Regents regarding new policies to increase the institution's diversity in the wake of Proposal 2); Univ. of Mich. Bd. of Regents Proceedings, June 2004, 301 (report

of University President to Board of Regents regarding undergraduate admissions policies in light of *Gratz*, including efforts to encourage minority applicants); Univ. of Mich. Bd. of Regents Proceedings, July 2003, 11 (discussion of the importance of race-conscious admissions policies in light of *Grutter*, including comments in support of the University's efforts in *Grutter* from six Regents and the University President), *available at* http://quod.lib.umich.edu/cgi/t/text/text-idx?page=browse&c=umregproc (last visited May 22, 2012). Thus, the elected boards of Michigan's public universities can, and do, change their respective admissions policies, making the policies themselves part of the political process.[7] But even if they did not, the Attorney General provides no authority to support his contention that an unused power is a power abandoned.

Nevertheless, the Attorney General argues, echoed by the dissenters, that admissions decisions lie outside the political process because the governing boards of the universities have "fully delegated" responsibility for establishing admissions standards to politically unaccountable admissions committees and faculty members. But the Michigan Constitution, state statutes, and the universities' bylaws and current practices directly contradict this argument. Article VIII, section 5 of the Michigan Constitution entrusts the board with "general supervision of its institution." Mich. Const. art. VIII, § 5. Michigan statutes §§ 390.3-.5 vest full governing authority in the board, including the power to enact bylaws and regulations to promote and achieve the university's educational mission. *See* Mich. Comp. Laws §§ 390.3-.5. The University of Michigan bylaws unambiguously retain the power to alter or revoke any bylaw, including any delegation of responsibility. *See* Univ. of Mich. Bylaws § 14.03. This robust legal authority makes the fact of such delegation irrelevant for our purposes, as the board may revoke the delegation at will.

Moreover, to the extent the Attorney General and the dissenters express concern over the degree to which the board has delegated admissions decisions, that delegation

---

[7] As the Michigan Constitution grants the power to establish other institutions of higher education beyond the three universities named above, *see* Mich. Const. art. VIII, § 6, to the extent the leadership of these institutions are democratically accountable, whether tangentially or directly, their powers are part of the political process.

does not affect whether admissions decisions should be considered part of the political process. When an elected body delegates power to a non-elected body for the day-to-day implementation of policy, it does not remove the policy from the political process. In the administrative law context, for example, rule-making powers are delegated from the President to appointed cabinet officials, and as a practical matter, further down to civil service professionals. Regardless of the level at which the rule is drafted, the rule-making process is at all times under the umbrella of the powers of the President. These rules are often the subject of political debate, lobbying, and electioneering, again without regard to who actually drafted the particular rule in question. Without question, federal rule-making is part of the political process. Similarly, whether it is the board or a delegated body that sets the rules for consideration of race in admissions, these decisions fall under the umbrella of the elected board and are thus part of the political process.

Telling evidence that board members can influence admissions policies—bringing such policies within the political process—is that these policies can, and do, shape the campaigns of candidates seeking election to one of the boards. As the boards are popularly elected, citizens concerned with race-conscious admissions policies may lobby for candidates who will act in accordance with their views—whatever they are. Board candidates have, and certainly will continue, to include their views on race-conscious admissions policies in their platforms. *See* League of Women Voters, 2005 General Election Voter Guide, *available at* http://www.lwvka.org/guide04/regents/html (last visited May 22, 2012) (noting that a candidate for the Board of Regents pledged to "work to end so-called 'Affirmative-Action,' a racist, degrading system"). Indeed, nothing prevents Michigan citizens from electing a slate of regents who promise to review admissions policies based on their opposition to affirmative action. Once elected, the new slate may revise the bylaws, *see* Univ. of Mich. Bylaws § 14.03, and change their university's admissions policies—either by entirely revoking the delegation and handling all admissions policies at the board level or by enacting new bylaws giving more explicit direction to admissions committees. Thus, Proposal 2 affects a "political process."

*ii. Reordering of a "Political Process"*

The next issue is whether Proposal 2 reordered the political process in a way that places special burdens on racial minorities. The Supreme Court has found that both implicit and explicit reordering violates the Fourteenth Amendment. *See Seattle*, 458 U.S. at 474; *Hunter*, 393 U.S. at 387, 390. In *Hunter*, the express language of the charter amendment required any ordinance regulating real estate "on the basis of race, color, religion, national origin or ancestry" to be approved by a majority of the electorate and the City Council, as opposed to solely the City Council for other real-estate ordinances. 393 U.S. at 387, 390. This reallocation of power was directly written into the charter amendment, creating "in effect . . . an 'explicitly racial classification treating racial housing matters differently'" from all other housing matters. *Seattle*, 458 U.S. at 468 (quoting *Hunter*, 393 U.S. at 389).

In *Seattle*, however, the reordering was implicit: On its face, Initiative 350 simply prohibited school boards from using mandatory busing, but its practical effect was to force "[t]hose favoring the elimination of *de facto* school segregation" to "seek relief from the state legislature, or from the statewide electorate" in order to overturn Initiative 350. *Id.* at 474. Nonetheless, "authority over all other student assignment decisions . . . remain[ed] vested in the local school board." *Id.* Whereas a proponent of smaller class sizes could seek redress at the local level, a proponent of integrative busing had to scale the more onerous hurdle of a successful statewide campaign. The *Seattle* legislation implicitly reallocated power because the "initiative remove[d] the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body . . . ." *Id.* Similar to the amendment in *Hunter*, Initiative 350 modified "the community's political mechanisms . . . to place effective decisionmaking authority over a racial issue at a different level of government." *Id.*

The *Seattle* Court then clarified what sort of reordering contravenes the political-process doctrine: "[t]he evil condemned by the *Hunter* Court was not the particular political obstacle of mandatory referenda imposed by the Akron charter amendment; it

was, rather, the *comparative structural burden* placed on the political achievement of minority interests." *Id.* at 474 n.17 (emphasis added).  In both *Hunter* and *Seattle*, "the effect of the challenged action was to redraw decisionmaking authority over racial matters—and only over racial matters—in such a way as to place *comparative burdens* on minorities." *Id.* (emphasis added).  Thus, any "comparative structural burden," be it local or statewide or national, satisfies the reordering prong of the *Hunter*/*Seattle* test. *Id.*

The comparative structural burden we face here is every bit as troubling as those in *Hunter* and *Seattle* because Proposal 2 creates the highest possible hurdle.  This comparative structural burden is most apparent in tracing the channels for change available to a citizen promoting any policy unmodified by Proposal 2 and those available to a citizen promoting constitutionally permissible race-conscious admissions policies.

An interested Michigan citizen may use any number of avenues to change the admissions policies on an issue outside the scope of Proposal 2.  For instance, a citizen interested in admissions policies benefitting legacy applicants—sons and daughters of alumni of the university—may lobby the admissions committees directly, through written or in-person communication.  He may petition higher administrative authorities at the university, such as the dean of admissions, the president of the university, or the university's board.  He may seek to affect the election—through voting, campaigning, or other means—of any one of the eight board members whom the individual believes will champion his cause and revise admissions policies accordingly.  And he may campaign for an amendment to the Michigan Constitution.

Each of these methods, respectively, becomes more expensive, lengthy, and complex.  Because Proposal 2 entrenched the ban on all race-conscious admissions policies at the highest level, this last resort—the campaign for a constitutional amendment—is the *sole recourse* available to a Michigan citizen who supports enacting such policies.  That citizen must now *begin* by convincing the Michigan electorate to amend its constitution—an extraordinarily expensive process and the most arduous of

all the possible channels for change. Just to place a proposed constitutional amendment repealing Proposal 2 on the ballot would require either the support of two-thirds of both the Michigan House of Representatives and Senate, *see* Mich. Const. art. XII, § 1, or the signatures of a number of voters equivalent to at least ten percent of the number of votes cast for all candidates for governor in the preceding general election, *see id.* art. XII, § 2. Once on the ballot, the proposed amendment must then earn the support of a majority of the voting electorate to undo Proposal 2's categorical ban. *See id.* art. XII, §§ 1-2.

Only after traversing this difficult and costly road would our now-exhausted citizen reach the starting point of his neighbor who sought a legacy-related admissions policy change. After this successful constitutional amendment campaign, the citizen could finally approach the university—by petitioning the admissions committees or higher administrative authorities—to request the adoption of race-conscious admissions policies. By amending the Michigan Constitution to prohibit university admissions units from using even modest race-conscious admissions policies, Proposal 2 thus removed the authority to institute any such policy from Michigan's universities and lodged it at the most remote level of Michigan's government, the state constitution. As with the unconstitutional enactment in *Hunter*, proponents of race-conscious admissions policies now have to obtain the approval of the Michigan electorate *and*, if successful, admissions units or other university powers—whereas proponents of other non-universal admissions factors need only garner the support of the latter. *See Seattle*, 458 U.S. at 468, 474.

The "simple but central principle" of *Hunter* and *Seattle* is that the Equal Protection Clause prohibits requiring racial minorities to surmount more formidable obstacles than those faced by other groups to achieve their political objectives. *See id.* at 469-70. A state may not "allocate[] governmental power nonneutrally, by explicitly using the *racial* nature of a decision to determine the decisionmaking process." *Id.* at 470. As the Supreme Court has recognized, such special procedural barriers to minority interests discriminate against racial minorities just as surely as—and more insidiously

than—substantive legal barriers challenged under the traditional equal protection rubric. *See id.* at 467 ("[T]he Fourteenth Amendment also reaches a political structure that treats all individuals as equals, yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation.") (internal quotation marks and citations omitted). Because less onerous avenues to effect political change remain open to those advocating consideration of non-racial factors in admissions decisions, Michigan cannot force those advocating for consideration of racial factors to traverse a more arduous road without violating the Fourteenth Amendment. We thus conclude that Proposal 2 reorders the political process in Michigan to place special burdens on minority interests.

### *3. Objections to the Applicability of the* Hunter/Seattle *Doctrine to Proposal 2*

The Attorney General and the dissenters make a number of arguments as to why Proposal 2 survives constitutional scrutiny. At the outset, it should be noted that adopting these arguments as to Proposal 2's constitutionality would be particularly ironic, given that these arguments applied with equal force to Initiative 350 in *Seattle*. While distinctions obviously exist between the policy at issue here and that in *Seattle*, the factual differences are not so material as to justify departure from relevant Supreme Court precedent.

### *a.* Hunter/Seattle *Doctrine and Preferential Treatment Programs*

The Attorney General and the dissenters assert that *Hunter* and *Seattle* are inapplicable to Proposal 2 because those cases only govern enactments that burden racial minorities' ability to obtain *protection from discrimination* through the political process, whereas Proposal 2 burdens racial minorities' ability to obtain *preferential treatment*. At bottom, this is an argument that an enactment violates the Equal Protection Clause under *Hunter* and *Seattle* only if the political process is distorted to burden legislation providing constitutionally-mandated protections, such as anti-discrimination laws. Under this theory, a state may require racial minorities to endure a more burdensome process than all other citizens when seeking to enact policies that are in their favor if

those policies are constitutionally *permissible* but not constitutionally *required*. This effort to drive a wedge between the political-process rights afforded when seeking anti-discrimination legislation and so-called preferential treatment is fundamentally at odds with *Seattle*.

The only way to find the *Hunter*/*Seattle* doctrine inapplicable to the enactment of preferential treatment is to adopt a strained reading that ignores the preferential nature of the legislation at issue in *Seattle*, and inaccurately recast it as anti-discrimination legislation. Initiative 350 prohibited the *voluntary* busing of students to correct *de facto* segregation. 458 U.S. at 460-61. The school board was under no obligation to undertake this effort because there had been no finding that the District's segregation was the result of intentional racial discrimination. *Id.* at 491-92 (Powell, J., dissenting) ("The Court has never held that there is an affirmative duty to integrate the schools in the absence of a finding of unconstitutional segregation. Certainly there is no constitutional duty to adopt mandatory busing in the absence of such a violation.") (internal citations omitted). As such, the District's plan was an ameliorative measure and not a response to discrimination. It is therefore inaccurate to suggest that Initiative 350 affected anti-discrimination legislation by making it more difficult for minorities to obtain *protection from discrimination* through the political process. Quite the contrary: as the district court recognized, "[b]ecause prohibiting integration (when it is not constitutionally mandated) is not tantamount to discrimination . . . the Court in *Seattle* did not (and could not) rely on the notion that the restructuring at issue impeded efforts to secure *equal treatment*."[8]  *Coal. VI*, 592 F. Supp. 2d at 951. Therefore, in applying the *Hunter*

---

[8]In holding that Proposal 2 nonetheless does not violate the Equal Protection Clause, the district court asserted that the race-conscious admissions policies at issue here should be distinguished from the voluntary busing program at issue in *Seattle* because, unlike race-conscious admissions policies, "school desegregation programs are not inherently invidious, do not work wholly to the benefit of certain members of one group and correspondingly to the harm of certain members of another group, and do not deprive citizens of rights." *Coal. VI*, 592 F. Supp. 2d at 951 (quoting *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 707 n.16 (9th Cir. 1997)). The district court erred in this respect.

Indeed, such a distinction is incompatible with the Supreme Court's decision in *Grutter*, and for this reason, we decline to follow *Coalition for Economic Equity v. Wilson*, 122 F.3d 692 (9th Cir. 1997), as the district court did. In *Grutter*, the Supreme Court showed how narrowly-tailored race-conscious admissions programs are not inherently invidious, *see* 539 U.S. at 334-44, and do not work wholly to the benefit of members of one group, *see id.* at 330. The Court further explained that "the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people,

political-process framework to an obstacle impeding preferential treatment, the *Seattle* Court drew no distinction between the equal protection rights at stake in seeking anti-discrimination legislation and those at stake in seeking preferential treatment.

It should be unsurprising, then, that the language of *Hunter* and *Seattle* encompasses any legislation in the interest of racial minorities, and thus is broader than it would be were the distinction urged by the Attorney General and the dissenters valid. *See, e.g.*, *Seattle*, 458 U.S. at 467 (noting that the Fourteenth Amendment protects against distortions of the political process that "place special burdens on the ability of minority groups to achieve *beneficial legislation*") (emphasis added); *id.* at 470 (requiring searching judicial scrutiny where state action makes it more difficult for racial minorities "to achieve *legislation that is in their interest*") (emphasis added) (internal quotation marks omitted); *id.* at 474 (finding it "enough that minorities may consider busing for integration to be *legislation that is in their interest*") (emphasis added) (internal quotation marks omitted); *Hunter*, 393 U.S. at 393 ("[T]he State may no more disadvantage any particular group by making it more difficult to enact *legislation in its behalf* than it may dilute any person's vote . . . .") (emphasis added).

This language makes clear that the *Hunter*/*Seattle* doctrine works to prevent the placement of special procedural obstacles on minority objectives, whatever those objectives may be. The distinction urged by the Attorney General and the dissenters thus erroneously imposes an *outcome*-based limitation on a *process*-based right. What matters is whether racial minorities are forced to surmount procedural hurdles in reaching their objectives over which other groups do not have to leap. If they are, the disparate procedural treatment violates the Equal Protection Clause, regardless of the objective sought.

---

cultures, ideas, and viewpoints." *Id.* Nor are we swayed by *Coalition to Defend Affirmative Action v. Brown*, 674 F.3d 1128 (9th Cir. 2012), which offered only conclusory support for the precedential decision in *Wilson*.

*b. Proposal 2 as a Mere Repeal*

Latching on to the Supreme Court's observation that "the simple repeal or modification of desegregation or antidiscrimination laws, without more, never has been viewed as embodying a presumptively invalid racial classification," *Crawford v. Bd. of Educ.*, 458 U.S. 527, 539 (1982); *accord Hunter*, 393 U.S. at 390 n.5; *Seattle* 458 U.S. at 483, the Attorney General implores us to classify Proposal 2 as a mere repeal of the universities' race-conscious admissions policies, rather than the kind of political restructuring that implicates the *Hunter/Seattle* doctrine. *Crawford*, a case decided the same day as *Seattle*, emphasizes the difference between mere repeals and political restructuring; state actors must retain the power to repeal policies without running afoul of the political-process doctrine—certainly not every policy elimination carries with it a political-process violation. *See* 458 U.S. at 540. *Crawford* brings this difference into focus, because the Court-approved political action in that case (amendment of the California Constitution) occurred at the same level of government as the original enactment (a prior amendment of the California Constitution), thus leaving the rules of the political game unchanged. *Id.*

The Supreme Court has twice distinguished the "mere repeal" at issue in *Crawford* from the political reordering at issue in *Hunter* and *Seattle*. The *Crawford* Court distinguished *Hunter* by clarifying that the charter amendment in *Hunter* was "something more than a mere repeal" because it not only repealed an ordinance adopted by the popularly elected City Council, it removed from the Council the power to reinstate it—more than just undoing an unpopular act, the electorate in *Hunter* had altered the framework of the political process. *Crawford*, 458 U.S. at 541. The *Seattle* Court drew the same distinction between the Washington State legislation and the California amendment: it found that Initiative 350 "works something more than the 'mere repeal' of a desegregation law by the political entity that created it . . . by lodging decisionmaking authority over the question at a new and remote level of government." *Seattle*, 458 U.S. at 483. Just as in *Hunter*, the electorate in *Seattle* changed the rules of the political process.

Here, the rules are not the same after Proposal 2.  Rather than undoing an act of popularly elected officials by simply repealing the policies they created, Michigan voters repealed the admissions policies that university officials created *and took the additional step* of permanently removing the officials' power to reinstate them.  In short, Proposal 2 "works something more than the 'mere repeal' of a desegregation law by the political entity that created it."  *Id.*  Had those favoring elimination of all race-conscious admissions policies successfully lobbied the universities' admissions units, just as racial minorities did to have these policies adopted in the first place, there would be no equal protection concern.  Rather, like Initiative 350 did for any future attempt to implement integrative busing (and the Akron city charter amendment did for any future attempt to enact a fair housing ordinance), Proposal 2 "burdens all future attempts" to implement race-conscious admissions policies "by lodging decisionmaking authority over the question at a new and remote level of government."  *Id.*

This reallocation of decisionmaking authority at a "new and remote level of government" distinguishes the instant case from *Crawford*.  *See id.*  Certainly, should Michigan's public universities want to abolish these race-conscious admissions policies, the admissions committees, the universities' presidents and provosts, and the universities' boards remain free to repeal them, without any infringement on the right to equal protection in the political process.  The avenues of change available to Michigan's public universities parallel those available to the District in *Seattle*.  In ruling the *statewide* repeal of the voluntary busing plan unconstitutional, the *Seattle* Court required any appeal to occur through *local* government, where the plan was originally enacted.  Our decision no more entrenches a race-conscious policy than the Supreme Court's decisions in *Seattle* or *Hunter*.  Indeed, while the dissenting opinions accuse us of judicially enshrining the presumptively invalid policy of considering race as one factor in holistic admissions determinations, we take no such step.[9]

_____

[9] Moreover, by definition, we are only addressing valid, constitutional policies; the university boards have no authority to promulgate invalid, unconstitutional policies.

More generally, the dissenting opinions criticize our holding today in broad and strident terms. At their core, these opinions express disapproval of the political-process doctrine itself, dissatisfaction that *Grutter* allowed for even modest race-conscious admissions policies, and incredulity at the possibility that a state constitutional amendment forbidding consideration of race could violate the Equal Protection Clause. But *Hunter* and *Seattle* have not been overruled; *Grutter* continues to permit the same holistic race-conscious admissions policies Proposal 2 seeks to permanently eliminate; and courts must decide equal protection challenges by application of precedent, rather than resort to syllogism. Most importantly, our holding does not place race-conscious admissions policies beyond the political process. Opponents of affirmative action remain free to advocate for their preferred policies in the same manner and at the same level of government as its proponents.

### 4. Constitutionality of Proposal 2 Under the Political-Process Doctrine

Proposal 2 modifies Michigan's political process "to place special burdens on the ability of minority groups to achieve beneficial legislation." *See id.* at 467. Because Proposal 2 fails the *Hunter*/*Seattle* test, it must survive strict scrutiny. *See id.* at 485 n.28. Under the strict scrutiny standard, the Attorney General must prove that Proposal 2 is "necessary to further a compelling state interest." *Crawford*, 458 U.S. at 536. In *Seattle*, the Court did not consider whether a compelling state interest might justify a state's enactment of a racially-focused law that restructures the political process, because the government made no such argument. 458 U.S. at 485 n.28. Likewise, because the Attorney General does not assert that Proposal 2 satisfies a compelling state interest, we need not consider this argument. Therefore, those portions of Proposal 2 that affect Michigan's public institutions of higher education violate the Equal Protection Clause.[10]

---

[10]Because the Plaintiffs' challenge is limited to public education, we do not decide today whether the portions of Proposal 2 that affect public employment and public contracting also violate the Equal Protection Clause.

*5. Traditional Equal Protection Analysis*

Having found that Proposal 2 deprives the Plaintiffs of equal protection of the law under the political-process doctrine, we need not reach the question of whether it also violates the Equal Protection Clause when assessed using the "traditional" analysis.

*B. The University Defendants' Non-Dismissal*

The University Defendants appeal the district court's denial of their motion to be dismissed as misjoined parties under Rule 21 of the Federal Rules of Civil Procedure. We review the district court's decision for an abuse of discretion and must affirm unless we are "left with a definite and firm conviction that the trial court committed a clear error of judgment." *Letherer v. Alger Group, L.L.C.*, 328 F.3d 262, 266 (6th Cir. 2003) (internal quotation marks and citation omitted), *overruled on other grounds by Powerex Corp. v. Reliant Energy Servs.*, 551 U.S. 224 (2007).

Rule 21 states in relevant part: "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. "The Federal Rules of Civil Procedure do not define misjoinder, but the cases make clear that misjoinder of parties occurs when [parties] fail to satisfy the conditions for permissive joinder under Fed. R. Civ. P. 20(a)." *Glendora v. Malone*, 917 F. Supp. 224, 227 (S.D.N.Y. 1996). Because a motion to be dismissed under Rule 21 tracks Rule 20(a), we must ask whether the Coalition Plaintiffs have satisfied the rules for permissive joinder. Under Rule 20(a), defendants may be joined if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). "A misjoinder of parties . . . frequently is declared because no relief is demanded from one or more of the parties joined as defendants." *Letherer*, 328 F.3d at 267 (quoting 7 Charles Alan Wright et al., *Federal Practice and Procedure* § 1683, at 475-76 (3d ed. 2001)).

The district court concluded that the University Defendants were properly joined parties under Rule 20(a) because the Coalition Plaintiffs asserted a request for relief on a claim involving common issues of law and fact. The district court found that "the claims brought against the universities are intertwined with those challenging Proposal 2," and "[i]f [the court] were to find Proposal 2 unconstitutional, affirmative action would not automatically be reinstated into the admissions process. Rather, the universities would have to choose to do so on their own." *Coal. IV*, 539 F. Supp. 2d at 941. Because the Coalition Plaintiffs' traditional equal protection claim could have required the University Defendants to grant relief by reinstating race-conscious admissions policies, the district court found Rule 20(a) satisfied and concluded that dismissal as a misjoined party was not appropriate. *See id.*

The discretionary language of Rule 21, coupled with our deferential standard of review, presents a high hurdle for reversal of the district court's determinations. The Coalition Plaintiffs asserted a right to relief against the University Defendants, and so we are not "left with a definite and firm conviction that the trial court committed a clear error of judgment," *Letherer*, 328 F.3d at 266, and affirm the district court's denial of the University Defendants' motion.

## C. Dismissal of Russell as an Intervenor

Intervening Defendant Russell appeals the district court's decision granting the Cantrell Plaintiffs' motion for summary judgment to dismiss him from the case because he no longer satisfied the requirements for intervention. We review de novo a district court's grant of summary judgment, which "should be granted when the moving party can show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (internal quotation marks omitted). We also review de novo district court decisions on motions to intervene as of right, except for the element of timeliness, which is reviewed for an abuse of discretion. *Northland Family Planning Clinic, Inc. v. Cox*,

487 F.3d 323, 344 (6th Cir. 2007). "Because the timeliness element is not in dispute here, we review the entire intervention of right issue de novo." *Id.*

At the time Russell originally moved to intervene as of right, he was an applicant to the University of Michigan Law School. With his application pending at the time Proposal 2 passed, Russell was permitted to intervene because he purportedly had an interest in the immediate termination of race-conscious admissions policies, as these policies could theoretically affect his chances of gaining admittance. During the pendency of this litigation, Russell has been denied admission from the University of Michigan Law School, attended and graduated from Wayne State University Law School, and following his graduation, accepted a position as a non-tenured lecturer at Oakland Community College and Oakland University.

Under Federal Rule of Civil Procedure 24(a), an interested party must meet four requirements before being permitted to intervene as of right: (1) his motion to intervene must be timely; (2) he must have a substantial legal interest in the subject matter of the case; (3) he must demonstrate that his interest will be impaired in the absence of intervention; and (4) he must demonstrate that the parties already before the court do not adequately represent his interest. *United States v. Michigan*, 424 F.3d 438, 443 (6th Cir. 2005). An intervenor also must continue to meet these requirements throughout the duration of the litigation, as courts must be able to ensure that parties have a live interest in the case. *See Morgan v. McDonough*, 726 F.2d 11, 14 (1st Cir. 1984) (affirming the dismissal of an intervening party whose legal interest had lapsed because "even if [the party's original intervention were as of right,] it would have gained no absolute entitlement to continue as a party until termination of the suit").

Although Russell met all four requirements when he was permitted to intervene, it has become apparent during the course of litigation that Russell can no longer demonstrate that the parties already before the court do not adequately represent his interests. Russell's burden of showing that "representation of his interests 'may be' inadequate" is "minimal," *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538

n.10 (1972), however, he still must overcome "the presumption of adequate representation" that arises if he shares "the same ultimate objective as a party to the suit," *United States v. Michigan*, 424 F.3d at 443-44.  Although the Attorney General's and Russell's interests initially diverged—the Attorney General agreed to stipulate to delay the application of Proposal 2, whereas Russell had an interest in Proposal 2's immediate enforcement—their interests are now aligned.  Both now share the same ultimate objective: the validation of Proposal 2.  The Attorney General is unquestionably mounting a firm defense of Proposal 2, including a victory in the district court.  Any "mere disagreement over litigation strategy" Russell may have with the Attorney General's defense "does not, in and of itself, establish inadequacy of representation." *Bradley v. Milliken*, 828 F.2d 1186, 1192 (6th Cir. 1987).  Therefore, there is no genuine issue of material fact as to whether the Attorney General adequately represents Russell's interests.  Russell's intervention in this litigation is no longer proper and we affirm the district court's grant of the Cantrell Plaintiffs' motion for summary judgment to dismiss him.

### III.

Finding those provisions of Proposal 2 affecting Michigan's public colleges and universities unconstitutional, we REVERSE the district court's judgment granting the Defendants-Appellees' motion for summary judgment.  We further AFFIRM the district court's denial of the University Defendants' motion to be dismissed as parties, and AFFIRM the district court's grant of the Cantrell Plaintiffs' motion for summary judgment as to Russell.

———————

**DISSENT**

———————

DANNY J. BOGGS, Circuit Judge, dissenting.  In 1848, the relevant local authority, the Boston School Board, decided that race should be used in making assignments in the Boston public schools.  *See Roberts v. City of Boston*, 59 Mass. 198, 208–09 (1849).  They excluded and segregated black students.  However, in 1855 the ultimate political authority, the legislature of Massachusetts, established the general principle against racial discrimination in educational choices.[1]  The legislature was lauded for that choice.  *See generally* J. Morgan Kousser, *"The Supremacy of Equal Rights": The Struggle against Racial Discrimination in Antebellum Massachusetts and the Foundations of the Fourteenth Amendment*, 82 Nw. U. L. Rev. 941, 943 & nn. 8–9 (1988).

Over 100 years later, various Michigan local and subordinate state authorities began to implement policies of racial discrimination in decisions on, *inter alia*, educational admissions.  The Supreme Court of the United States held that such actions were permissible, but certainly not that they were compelled.  *Grutter v. Bollinger*, 539 U.S. 306 (2003).  Subsequently, the ultimate state political authority, the People of Michigan, voted to establish the same principle that Massachusetts did in 1855.[2]  This is the same principle embodied in President Kennedy's Executive Order 10925 of 1961—that governmental decisions should be undertaken "without regard to race, creed,

———————

[1] "In determining the qualifications of scholars to be admitted into any public school or any district school in this Commonwealth, no distinction shall be made on account of the race, color or religious opinions, of the applicant or scholar."  1855 Mass. Acts ch. 256.

[2] "The Univeristy of Michigan, Michigan State University, Wayne State University, and any other public college or university, community college, or school district shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting."  Mich. Const. art. I, § 26.

color or national origin." 26 Fed. Reg. 1977, sec. 301(1) (Mar. 8, 1961). Indeed, the very term "affirmative action" comes from that presidential order.[3]

The majority of the en banc court now holds that this action of the People of Michigan was unconstitutional, relying on an extreme extension of two United States Supreme Court cases ruling on very different circumstances.

To begin with, those two cases each involved a single action that transferred, for the first time, decision making on a single matter, a transfer held to be wholly aimed at one disadvantaged race. In one instance, approval of new anti-discrimination ordinances was moved from the city council to the voters of the city of Akron, and in the other case, power over certain pupil assignment policies was moved from the citizens of one city in the state of Washington to the citizens of the entire state.

In our case, however, we have the citizens of the entire state establishing a principle that would in general have seemed laudable. Even plaintiffs here do not allege, in the context of their political-process argument, that if this constitutional provision had been enacted at some earlier time in Michigan, for example upon its entry into the union, or upon the enactment of its new constitution in 1963, that it would have been unconstitutional. They instead contend that because of current circumstances, and intervening political decisions of racial discrimination, these Supreme Court cases make the principled action of the People of Michigan unconstitutional.

Indeed, the majority seems to concede that some set of decision makers in Michigan would be able to reverse the policies that they claim are immune from actions by the entire body politic. Rather, they demand that any changes in the educational (and perhaps employment) policies here can be enacted only by individual actions of each of the university governing authorities (three of which are chosen by statewide election over eight years, Mich. Const. art. VIII § 5), each regional state university (whose

---

[3]"The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, creed, color, or national origin." *Ibid.*

governing boards are appointed on a staggered basis by the governor over eight years, *id.* § 6), and each local educational authority for community and technical schools (whose governing authorities are chosen by a variety of methods by each individual county and locality, *id.* § 7).

Thus, plaintiffs here contend that a citizen or student, whether from the Upper Peninsula or the city of Detroit, or from another state, who wants to pursue educational and employment opportunities in Michigan free from racial discrimination, must contest and succeed, one-by-one, in elections or selections in all of the many individual jurisdictions and methods of selection.

To simply state this proposition is to show how far afield this situation is from even the most generous interpretation of the *Hunter* and *Seattle* cases.

In addition, the situation in Michigan, in which the various local authorities are *permitted* (under *Grutter*) to engage in varieties of racial discrimination, both for and against variously defined groups, is wholly at odds with the single-instance restructuring of government involved in the Supreme Court precedents relied on by the majority.

Here, it was clear from the evidence in the *Grutter* case, and in the record in this case, discrimination may be practiced in favor of certain racially or ethnically defined minorities, primarily African-Americans (or perhaps those deemed to be "black," whether or not actually "American") or "Hispanics" (although there was some evidence that some groups generally defined as "Hispanic" (especially Cuban) might be discriminated against rather than in favor of, *see* Deposition of Allan Stillwagon, pp. 358-59, cited in *Grutter*, 539 U.S. at 293 (Kennedy, J., dissenting)).  On the other hand, various groups, sometimes defined as racial minorities, may be discriminated against. *See Ho v. S.F. Unified Sch. Dist.*, 965 F. Supp. 1316 (N.D. Calif 1997) (Chinese); *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604 (1987) (Arabs); *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) (Jews).

Under these circumstances, holding it to be a violation of equal protection for the ultimate political authority to declare a uniform policy of non-discrimination is vastly far afield from the Supreme Court precedents.

I give the following example which is not fanciful in today's changing society. A child might be born who would, in today's conventional terms, be held to be one-half Chinese, one-fourth Eastern-European Jewish, one-eighth Hispanic (Cuban), and one-eighth general North European, mostly Scots-Irish. Under those circumstances, if that child or its parents wished it to compete for educational or employment opportunities in Michigan without discrimination for or against the child, however a bureaucrat might classify the child, the majority's position is that they could do so only by proceeding in a large number of individual political and election campaigns across the length and breadth of Michigan, rather than by, as was the case here, convincing voters of Michigan to enact a policy that would under most other circumstances have been held to be laudable.

I cannot agree that this decision is correct, either as a matter of general constitutional law or as an accurate interpretation of the Supreme Court precedents. I therefore respectfully DISSENT.

———————

## DISSENT

———————

JULIA SMITH GIBBONS, Circuit Judge, dissenting.   Proposal 2 is not unconstitutional under either a political restructuring theory or under traditional equal protection analysis.  I therefore respectfully dissent.

## I.

Elementary principles of constitutional law tell us that plaintiffs' challenge to Proposal 2 should have  little to no chance of success.  Plaintiffs argue that Michigan must retain its racial and other preference policies in higher education and that the state's voters cannot make the contrary  policy choice that factors like race and gender may not be taken into account in admissions.  They make this argument in the face of the core equal protection principle of nondiscrimination—a principle consistent with the choice of the people of Michigan.  They make the argument despite the absence of any precedent suggesting that states must employ racial preferences in university admissions.  Essentially, the argument is one of constitutional protection for racial and gender preference—a concept at odds with the basic meaning of the Equal Protection Clause, as understood and explained through decades of jurisprudence.

Although it has convinced a majority of this court, plaintiffs' argument must be understood for the marked departure it represents—for the first time, the presumptively invalid policy of racial and gender preference has been judicially entrenched as beyond the political process.  In reaching its conclusion, the majority strays from analysis bounded by familiar principles of constitutional law and loses sight of the parameters within which we should operate in deciding this case.  To be accurate in characterizing the majority's approach, it relies on two Supreme Court cases, which it deems highly instructive.  Yet, when examined carefully, these cases have no application here, and, in emphasizing them, the majority overlooks recent case law providing more relevant guidance.

**II.**

The political restructuring theory on which the majority relies does not invalidate Proposal 2.  Racial preference policies in university admissions—presumptively invalid but permissible under limited circumstances and for a finite period of time—do not receive the same structural protections against statewide popular repeal as other laws that inure to the interest of minorities.  To understand why this is the case, it is necessary to view the *Hunter/Seattle* doctrine in the context of the recent decisional law of race-based classification.  *See Grutter v. Bollinger*, 539 U.S. 306, 327 (2003) ("Context matters when reviewing race-based governmental action under the Equal Protection Clause.").

In holding that student-body diversity is a compelling state interest that can justify the narrowly tailored use of race in university admissions policies, *Grutter* set forth three principles about race-based admissions policies that bear repeating here. First, *Grutter* reminded us that "'[a] core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race'" and that, as a consequence, "race-conscious admissions policies must be limited in time."  *Grutter*, 539 U.S. at 341, 342 (quoting *Palmore v. Sidotti*, 466 U.S., 429, 432 (1984)).  This principle makes sense because all "racial classifications are presumptively invalid . . . ." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 736 (2003).  Second, *Grutter* indicated that the decision to end race-conscious admissions policies is primarily one to be made by states and their public universities, not courts.  *See Grutter*, 539 U.S at 342 (noting that "sunset provisions . . . and periodic reviews" could be used to determine the continuing necessity of racial preferences and noting with favor race-neutral alternatives already employed in several states).  And third, while racially conscious admissions policies are permitted, they are not constitutionally required.  *Id.* at 325 ("[S]tudent body diversity is a compelling state interest that *can* justify the use of race in university admissions.") (emphasis added); *see Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 249 (6th Cir. 2006) ("*Grutter* never said, or even hinted, that state universities *must* do what they narrowly *may* do.").

**A.**

With these core principles in mind we examine the applicability of *Hunter* and *Seattle* to the passage of Proposal 2 in Michigan.  We begin with *Hunter v. Erickson*, 393 U.S. 385, 386-87, 390 (1969), in which Akron voters repealed a fair housing ordinance that banned discrimination in the sale or lease of real property and created a more burdensome process for minorities to seek such protection.  393 U.S. at 386–87, 390.  The underlying law—the repeal of which was effected through section 137 of the City Charter and was found to violate the political restructuring doctrine—protected minorities by mandating their equal right to be free from discrimination.  *Id.* at 390–93. *Hunter* thus involved the repeal of a presumptively valid law that mandated equal treatment; it did not involve the repeal of a racial preference policy or any other law that was itself presumptively invalid.  *See Coral Constr., Inc. v. San Francisco*, 235 P.3d 947, 959 (Cal. 2010) ("In no sense did [*Hunter*] concern preferences . . . .").  Because *Hunter* considered only the political-process implications of repealing a law that required *equal* treatment, it cannot be read broadly to apply to the repeal of a law requiring *preferential* treatment.  As we have observed, "[t]hese are fundamentally different concepts."  *Granholm*, 473 F.3d at 251; *see Coal. for Econ. Equity  v. Wilson*, 122 F.3d 692, 708 (9th Cir. 1997) ("It is one thing to say that individuals have equal protection rights against political obstructions to equal treatment; it is quite another to say that individuals have equal protection rights against political obstructions to preferential treatment.").  Thus, *Hunter* does not guide us here.

Nor does *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982), suggest application of the political restructuring doctrine to Proposal 2.  The underlying law in *Seattle* was a local ordinance that implemented a series of school desegregation measures, which was repealed by a statewide referendum called Initiative 350. *Seattle*, 458 U.S. at 460–62.  In finding that the passage of Initiative 350 violated the political structure doctrine, *Seattle* explained that "when the political process or the decisionmaking mechanism used to *address* racially conscious legislation—and only such legislation—is *singled out for peculiar and disadvantageous treatment*, the

governmental action plainly rests on distinctions based on race." 458 U.S. at 485 (second emphasis supplied) (internal quotation marks omitted); *see also id.* at 474 ("The initiative removes the authority to address a racial problem—*and only a racial problem*—from the existing decisionmaking body . . . ." (emphasis supplied)). In other words, in order to trigger political-process concerns, *Seattle* instructs that the challenged enactment must single out racial issues or racially oriented legislation. And indeed, the challenged enactment in *Seattle*, though facially neutral, was "carefully tailored to interfere only with desegregative busing"—that is, to address "only a racial problem." *Id.* at 471 & n.14, 474. That is not the case here. Proposal 2 does not address "only a racial problem:" it prohibits any preference on the basis of race, sex, color, ethnicity, or national origin. Mich. Const. art. I. § 26. Nor was Proposal 2 "carefully tailored" to affect only university admissions: it extends not just to public universities but also to public employment and public contracting. *Id.* Accordingly, Proposal 2 is quite unlike the narrow anti-busing measure struck down in *Seattle*; it represents "a sea change in state policy, of a kind not present in *Seattle* or any other 'political structure' case." *See Coral Constr.*, 235 P.3d at 966 (Corrigan, J., concurring).

The majority is quick to conclude that Proposal 2 and Initiative 350 each target policies—affirmative action and integrative busing, respectively—that "inure[] primarily to the benefit of the minority" and therefore each has a "racial focus." (Maj. Op. at 15–18.) But in a political-restructuring challenge, it is not enough to observe that some of the policies affected by the challenged enactment primarily benefit minorities. Nor is it enough to observe that, as here, the challenged enactment was passed in response to a high-profile case permitting racially conscious admissions policies under some circumstances. Though relevant, these observations are alone insufficient: in a political restructuring case, it is imperative to consider the scope of the challenged enactment itself.[1] The majority fails to account for the broad substantive reach of Proposal 2 when

---

[1]It is true that *Hunter* involved a challenged enactment that thwarted the passage of local ordinances focusing not only on racial but also on religious and ancestral discrimination. *Hunter*, 393 U.S. at 386. But *Hunter*'s section 137 was far narrower than Proposal 2 in that it did not extend to sex nor did it apply beyond housing matters. Furthermore, as explained above, *Hunter* did not even arguably involve the repeal of a law instituting racial preferences and thus does not suggest application of the political

compared to the narrow focus of Initiative 350 and, in so doing, improperly stretches the political restructuring doctrine that *Seattle* articulates to the instant case.

There is an additional reason that the political restructuring doctrine should not apply here, a reason that has less to do with *Seattle* itself than with the evolution of equal protection jurisprudence since it was decided. Today, it is plain that a racially conscious student assignment system—such as the one that the *Seattle* initiative attempted to make more difficult to enact—would be presumptively invalid and subject to strict scrutiny. *See Parents Involved in Cmty. Sch. v. Seattle Schs. Dist. No. 1*, 551 U.S. 701, 720 (2007) ("[T]he school districts must demonstrate that the use of individual racial classifications in the assignment plans here under review is narrowly tailored to achieve a compelling government interest." (internal quotation marks omitted)). But that was not always the case. As the California Supreme Court has observed, "at the time *Seattle* was decided, the high court's prior decisions indicated that the assignment of pupils by ratios to achieve racial balance fell 'within the broad discretionary powers of school authorities' to formulate 'educational policy' and to 'prepare students to live in a pluralistic society . . . .'" *Coral Constr.*, 235 P.3d at 959 (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971)); *see N.C. State Bd. of Educ. v. Swann*, 402 U.S. 43, 45 (1971) ("[S]chool authorities have wide discretion in formulating school policy, and that as a matter of educational policy school authorities may well conclude that some kind of racial balance in the schools is desirable quite apart from any constitutional requirements."); *see* Deborah N. Archer, *Moving Beyond Strict Scrutiny: The Need for A More Nuanced Standard of Equal Protection Analysis for K Through 12 Integration Programs*, 9 U. Pa. J. Const. L. 629, 648 & n.118 (2007) (writing, prior to *Parents Involved*, that "strict scrutiny has never been applied in the context of school desegregation by the Supreme Court"); *cf. Parents Involved*, 551 U.S. at 737 (plurality) ("[W]hen *Swann* was decided, this Court had not yet confirmed that strict scrutiny applies to racial classifications like those before us [*i.e.*, a racially conscious student

restructuring doctrine here.

assignment program].").  Indeed, it was not until 1995 that the Supreme Court made clear in *Adarand Contractors, Inc. v. Pena*, 515 U.S. 200, 227 (1995), that strict scrutiny applies to all racial classifications.  *See Parents Involved*, 551 U.S. at 720 (majority opinion) (citing *Adarand*); *id.* at 739 n.16 (plurality opinion) (citing *Adarand*); *id.* at 758 (Thomas, J., concurring) (citing *Adarand*); Jonathan Fischbach *et al.*, *Race at the Pivot Point: The Future of Race-Based Policies to Remedy De Jure Segregation After Parents Involved in Community Schools*, 43 Harv. C.R.-C.L. L. Rev. 491, 529–30 (2008) ("*Adarand* . . . established the uniform application of strict scrutiny to all racial classifications."); Jed Rubenfeld, *The Anti-Antidiscrimination Agenda*, 111 Yale L.J. 1141, 1168 (2002).

Thus, when articulating the reach of the political restructuring doctrine, *Seattle* did not consider that the underlying policy affected by the challenged enactment was presumptively invalid.[2]  But we must consider that fact here.  And indeed, the circumstance that racially conscious admissions policies are subject to the most exacting judicial scrutiny and limited in time—legal realities that the *Seattle* Court neither confronted nor factored into its decision—counsels heavily against applying the political restructuring doctrine to the enactment of Proposal 2.  *See Grutter*, 539 U.S. at 341–42. *Grutter*'s charge that "[u]niversities in other States can and should draw on the most promising aspects of . . . race-neutral alternatives as they develop" only underscores this point.  *Id.* at 342.  So while the majority is correct that *Seattle* employs broad language about protecting the "'ability of minority groups to achieve *beneficial legislation*'" (Maj. Op. at 32 (quoting *Seattle*, 458 U.S. at 467)), it must be remembered that the "beneficial" policy that Proposal 2 purportedly makes more difficult to enact is itself "'highly

---

[2]While the dissent in *Seattle* suggested that the busing program be subject to strict scrutiny, 458 U.S. at 492 n.6 (Powell, J., dissenting), the majority did "not specifically pass on that issue" because no one had challenged "the propriety of race-conscious student assignments for the purpose of achieving integration, even absent a finding of prior *de jure* segregation." *Id.* at 472 n.15 (majority opinion); *see also Parents Involved*, 551 U.S. at 721 n.10 (noting that in *Seattle* the question of "whether a district's voluntary adoption of race-based assignments in the absence of a finding of prior *de jure* segregation was constitutionally permissible" was "an issue . . . expressly reserved").

suspect.'"**3**  *Grutter*, 539 U.S. at 326 (quoting *City of Richmond v. J.A. Cruson Co.*, 488 U.S. 469, 493 (1989)).  This is exactly the type of "[c]ontext [that] matters when reviewing race-based governmental action under the Equal Protection Clause."  *Id.* at 327.  In short, equal protection jurisprudence regarding the use of racial classifications has developed markedly since *Seattle* was decided, and this development makes clear that applying the political restructuring doctrine to the enactment of Proposal 2 is hardly appropriate.

## B.

In concluding that a race-based classification that is presumptively invalid, but permissible under limited circumstances and for a finite period of time, receives the same structural protections against statewide popular repeal as other laws that inure to the interest of minorities, the majority walks alone.  The two highest courts to have considered the question have concluded that the political restructuring doctrine of *Hunter* and *Seattle* does not prevent the statewide popular elimination of race-based classification policies.  The Ninth Circuit concluded that California's Proposition 209, which eliminated public race-based and gender-based affirmative action programs, did not violate equal protection because "[i]mpediments to preferential treatment do not deny equal protection."  *Wilson*, 122 F.3d at 708.  The court relied on an essential constitutional principle: "While the Constitution protects against obstructions to equal treatment, it erects obstructions to preferential treatment by its own terms . . . . The Equal Protection Clause, parked at our most 'distant and remote' level of government, singles out racial preferences for severe political burdens—it prohibits them in all but the most compelling circumstances."  *Id.*  The Ninth Circuit recently affirmed its commitment to the reasoning in *Wilson*, finding it "easily reconciled" with *Grutter*.  *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1136 (9th Cir. 2012).  The California Supreme Court came to the same conclusion, quoting *Grutter* for the principle that

---

**3**For this reason, it is unimportant whether at the challenged enactment in *Seattle* imposed "an obstacle impeding preferential treatment" (Maj. Op. at 30) or whether the enactment merely made it more difficult to seek protection from discrimination.  Whatever the case, *Seattle* did not involve the rights of minorities to a policy that was presumptively invalid and explicitly limited in time.

"'racial classifications, however compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands. Enshrining a permanent justification for racial preferences would offend this fundamental equal protection principle.'" *Coral Constr.*, 235 P.3d at 960 (quoting *Grutter*, 539 U.S. at 342). The court explained that "[i]nstead of burdening the right to equal treatment, [the statewide referendum banning race-based classification] directly serves the principle that 'all governmental use of race must have a logical end point.'" *Id*. (quoting *Grutter*, 539 U.S. at 342). Our own district court agreed: "Proposal 2 does not offend the Equal Protection Clause by distancing racial minority groups from the means of obtaining *equal* protection." *Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.*, 539 F. Supp. 2d 924, 957 (E.D. Mich. 2008).

The teaching of these cases is that equal treatment is the baseline rule embodied in the Equal Protection Clause, from which racial-preference programs are a departure. *See Grutter*, 539 U.S. at 342 ("[R]ace-conscious admissions programs . . . [are a] deviation from the norm of equal treatment of all racial and ethnic groups . . . ."). These programs—fundamentally different from the underlying policies in *Hunter* and *Seattle*—cannot receive special sanctuary from a decision of the majority of voters to return their law to the equal protection norm of equal treatment.

### III.

There is another reason that *Hunter* and *Seattle* cannot forbid the amendment of the Michigan Constitution through the passage of Proposal 2. In both cases the relevant lawmaking authority was reallocated from a local legislative body to the "more complex government structure," *id.* at 477, of the city- or state-wide general electorate, thereby placing a "comparative structural burden . . . on the political achievement of minority interests," *id.* at 475 n.17. A key consideration in analyzing a *Hunter* political structure challenge, therefore, is whether the challenged law affects the ability of minorities to secure "legislation that is in their interest" as minorities. *Id.* at 474 (internal quotation marks omitted); *see also id.* at 475 n.17 ("Thus, in *Hunter*, the procedures for enacting

racial legislation were modified in a such a way as to place effective control in the hands of the citywide electorate. Similarly here [in *Seattle*], the power to enact racial legislation has been reallocated."). As the record here demonstrates, the people of Michigan have not restructured the state's lawmaking process in the manner prohibited by *Hunter* and *Seattle*. Instead, their vote removed admissions policy from the hands of decisionmakers who were unelected and unaccountable to either minority or majority interests and placed it squarely in an electoral process in which all voters, both minority and majority, have a voice.

## A.

Public higher education in Michigan is unique in that "[t]he Michigan Constitution confers a unique constitutional status on [Michigan's] public universities and their governing boards." *Federated Publ'ns, Inc. v. Bd. of Trs. of Mich. State Univ.*, 594 N.W.2d 491, 495–96 (Mich. 1999) (citing Mich. Const. art. VIII, §§ 5 and 6). These boards are "the highest form of juristic person known to the law, a constitutional corporation of independent authority, which, within the scope of its functions, is co-ordinate with and equal to that of the legislature." *Id.* at 496 n.8 (quoting *Bd. of Regents of the Univ. of Mich. v. Auditor Gen.*, 132 N.W. 1037, 1040 (Mich. 1911)). Each governing board is vested with the power of "general supervision of its institution and the control and direction of all expenditures from the institution's funds." Mich. Const. art. VIII, § 5. The constitution provides for eight-member governing boards, elected to statewide office for eight-year terms, Mich. Const. art. VIII, § 5, and elections are typically staggered, with, for example, an election every two years for regents of the University of Michigan.

Although these universities and their respective boards are created by the Michigan Constitution, the admissions policies are placed within the control of the boards or school authorities only within each board's bylaws. Thus, the admissions policies are not established by the state constitution, and it is necessary to look to testimony to determine where the power to set admissions policy lies.

The governing boards have fully delegated the responsibility for establishing admissions standards to several program-specific administrative units within each institution, which set admissions criteria through informal processes that can include a faculty vote. For example, at the University of Michigan Law School the admissions policy is set by the law school faculty admissions committee, with major substantive changes occasionally voted upon by the entire law school faculty. Similarly, as described by its former dean, at the Wayne State University Law School the ultimate decision whether to change admissions standards rests with the faculty alone. Thus, as the Cantrell Plaintiffs readily admitted in their previous briefing, the "faculty are the primary architects of all the admissions criteria and protocols."

As the deans of both law schools explained, at neither university is there a system in place to review or alter admissions policies at a level above a vote of the faculty. Sarah Zearfoss, the dean of admissions at the University of Michigan Law School, testified that no one could change the school's admissions policy other than the faculty admissions committee or the faculty itself, because "there's no higher body" to which someone unhappy with an admissions policy could advocate change. And Frank Wu, then the dean at Wayne State University Law School, agreed that "only the faculty at the law school has the authority to create and approve the admissions policy" at the school. Indeed, Wu testified that the admissions policy is not subject to the approval of the Wayne State University Board of Governors, and, in his view, if the Board of Governors attempted to alter the decision of the law school's faculty with respect to criteria for admission, "it would precipitate a constitutional crisis." Each institution's board may superficially have "plenary authority" over its respective institution (*see* Maj. Op. at 20), but the real authority to set admissions policy rests with each program-specific faculty within the universities.

The majority ignores the factual testimony of Deans Zearfoss and Wu, which explains how admissions policies are *actually* crafted. Instead, the majority emphasizes that the boards—although they have fully delegated their decisionmaking power to admissions directors and faculty—can revoke this authority and can revise any bylaw

in order to effect changes in university admission policies. That the boards can legally revoke a delegation of authority or have occasionally revised their bylaws to effect a change in admissions policy, however, does not change the underlying factual reality that the law school deans describe. Their testimony demonstrates that program-specific faculties do not merely manage the "day-to-day implementation of policy," (Maj. Op. at 23); these entities also set and change admissions policies—without any significant oversight by the boards.

## B.

The decisionmaking structure at the universities is important because these program-specific faculty admissions committees are far afield from the legislative bodies from which lawmaking authority was removed in *Hunter* and *Seattle*. To appreciate this critical difference, we need look no further than *Seattle* itself.

In *Seattle*, the Court emphasized that the type of action it found objectionable was the creation of comparative burdens "on minority participation in the political process." 458 U.S. at 480 n.23; *see id.* at 486 ("[M]inorities are no less powerless with the vote than without it when a racial criterion is used to assign governmental power in such a way as to exclude particular racial groups 'from effective participation in the political proces[s].'" (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 94 (1980) (White, J., dissenting))). The *Seattle* majority, however, did not view state university admissions committees as a part of the "political process" in the manner of an elected school board or city council. A dialogue between the majority and dissent in *Seattle* is particularly instructive on this point. In dissent, Justice Powell, critiquing the potential breadth of the majority's holding, argued:

> Thus, if the admissions committee of a state law school developed an affirmative-action plan that came under fire, the Court apparently would find it unconstitutional for any higher authority to intervene unless that authority traditionally dictated admissions policies. As a constitutional matter, the dean of the law school, the faculty of the university system as a whole, the university president, the chancellor of the university, and the

board of regents might be powerless to intervene despite their greater authority under state law.

*Id.* at 498 n.14 (Powell, J., dissenting). The majority, however, flatly dismissed this concern as a misunderstanding of the court's decision: "It is evident, then, that the horribles paraded by the dissent, *post*, at [footnote 14 of the dissent]—*which have nothing to do with the ability of minorities to participate in the process of self-government*—are entirely unrelated to this case." *Id.* at 480 n.23 (emphasis added).

For the *Seattle* majority, then, an impermissible reordering of the political process meant a reordering of the processes through which the people exercise their right to govern themselves. *See id.* at 486 ("And when the State's allocation of power places unusual burdens on the ability of racial groups to *enact legislation* specifically designed to overcome the 'special condition' of prejudice, the governmental action seriously 'curtail[s] the operation of those political processes ordinarily to be relied upon to protect minorities' . . . from the 'majoritarian political process.'" (emphasis added) (quoting *United States v. Carolene Prods. Co.* 304 U.S. 144, 153 n.4 (1938); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973))); *see id.* at 467 ("But the Fourteenth Amendment also reaches a "'political structure that treats all individuals as equals' . . . yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to *achieve beneficial legislation*." (emphasis added) (quoting *Bolden*, 446 U.S. at 84)).

Thus, the academic processes at work in state university admissions in Michigan are not "political processes" in the manner contemplated in *Seattle*. Unlike the Seattle School Board and the Akron City Council, the various Michigan university admissions committees and faculty members are unelected. As at most public universities, tenured faculty members have significant vested rights associated with their employment in order to preserve academic freedom and independence. The faculty members who are permitted to vote on policy matters are therefore significantly insulated from political pressure by virtue of their tenure. These faculty are beholden to no constituency—student, local, or otherwise. And, as demonstrated by the testimony of

the law school deans in this case, the people of Michigan have no ability to exert electoral pressure on the university decision makers to change their admissions polices. As they currently stand, the faculty admissions committees are islands unto themselves, vested with the full authority to set admissions policy for their respective university programs.

Of course, when an elected body delegates a power, it does not automatically follow that the delegatee's decisions fall outside the political process. But that is not the point. Rather, the testimony of the law school deans demonstrates that, whatever the formal legal structure, the faculty committees set admissions policies without significant review by the boards—thus insulating them from the political pressures the boards themselves face.[4]

Furthermore, there is no "local" university constituency as there is a local constituency for a city council or city school board, *i.e.*, the city's voters. Rather, despite there being a broad student, faculty, and staff *community* associated with each university, Michigan's state universities were established as state-wide institutions with a state-wide *constituency*. The faculty admissions committees therefore do not "represent" any local constituency at all. This is particularly important because the *Seattle* majority looked closely at the fact that Washington's lodging of political decisionmaking authority over the busing question at the statewide level directly burdened minority interests by "mak[ing] the enactment of racially beneficial legislation difficult, [because] the particular program might not have inspired opposition had it been promulgated through

---

[4]*Nyquist v. Lee*, 318 F. Supp. 710 (W.D.N.Y. 1970), *aff'd Nyquist v. Lee*, 402 U.S. 935 (1971), a case from the Western District of New York that was summarily affirmed by the Supreme Court and cited in *Seattle*, is not to the contrary. In *Nyquist*, the court found that a New York statute that "prohibit[ed] state education officials and appointed school boards from assigning students, or establishing, reorganizing or maintaining school districts, school zones or attendance units for the purpose of achieving racial equality in attendance" unconstitutionally reordered the political process in violation of the Equal Protection Clause. *Nyquist*, 318 F. Supp. at 712, 720. The fact that *appointed* school boards were part of the political process at issue in *Nyquist* does not mean that the university faculty admissions committees are similarly part of the political process. The decision in *Nyquist* made note of how the local boards were accountable to the community: "Parties considering themselves aggrieved by local board actions may seek to have the Commissioner enforce those policies. [The New York statute], however, singles out for different treatment all plans which have as their purpose the assignment of students in order to alleviate racial imbalance." *Id.* at 719 (internal citations omitted). Thus, even the *appointed* school boards were accountable to the community in a way in which the faculty admissions committees certainly are not.

the usual [local] legislative processes used for comparable legislation." 458 U.S. at 483–84.  The Court continued:

> That phenomenon is graphically demonstrated by the circumstances of this litigation. The longstanding desegregation programs in Pasco and Tacoma, as well as the Seattle middle school integration plan, have functioned for years without creating undue controversy. Yet they have been swept away, along with the Seattle Plan, by Initiative 350.  As a practical matter, it seems most unlikely that proponents of desegregative busing in smaller communities such as Tacoma or Pasco will be able to obtain the statewide support now needed to permit them to desegregate the schools in their communities.

*Id.* at 484 n.27.  The availability of "local" decisionmaking is therefore important when the political power of groups who could succeed at the local level is diluted in the statewide decisionmaking process.   The universities here, however, are statewide institutions with a statewide constituency.  There is nothing local about them.

Nor are the committees particularly accessible or subject to effective lobbying. While members of the public may attend faculty meetings at which admissions standards are reviewed, there is no formal mechanism by which a member of the public—student or not—can move the committees to amend the admissions standards.  And while interested students and members of the public are, with advance notice, permitted to speak at faculty meetings to comment on the admissions policies, the committees are not required to consider these comments seriously, issue written findings addressing these concerns, or do more than provide a forum for interested individuals to speak.  Rather, it appears that the main source of divergent views on admissions policies is the faculty members themselves.

The lack of a viable electoral mechanism to change university admissions policies at a sub-constitutional level means that the voters' use of a constitutional amendment in this instance does not serve to create "comparative structural burden[s] . . . on the political achievement of minority interests."  *Seattle*, 458 U.S. at 474 n.17. If, as the evidence before this court makes plain, the voters cannot exert electoral pressure on independent faculty committees, then all voters regardless of racial identity

compete on the same level for the political achievement of their higher-education interests: the constitutional level.  This state constitutional amendment does not, then, create an improper comparative structural burden, but rather merely requires proponents of the use of racial preferences in admissions policy to engage the same level of process followed by proponents of Proposal 2.  Thus, contrary to what the majority suggests, the burden upon a citizen who advocates for legacy preferences in university admissions is similar to the burden upon a citizen who advocates for racial preferences.  Although the former *may* attempt to lobby a faculty committee or university directly, these entities—according to the clear testimony of the law school deans and the manner in which authority has been delegated—will likely be unresponsive.  Likewise, efforts to elect a particular board member, where the evidence demonstrates that the boards do not alter the admissions policies approved by the faculty committees, will similarly have little effect on admission policies.

Although the majority appears to see no reason to distinguish between the unelected and unresponsive program-specific faculty admissions committees here and the legislative bodies from which lawmaking authority was removed in *Hunter* and *Seattle*, a consideration of political accountability in the political process is squarely grounded in the *Seattle* opinion.  In *Seattle*, the Court undertook a close examination of Washington's system of "establish[ing] the local school board, rather than the State, as the entity charged with making decisions of the type at issue," 458 U.S. at 477:

> But Washington has chosen to meet its educational responsibilities primarily through "state and local officials, boards, and committees," and the responsibility to devise and tailor educational programs to suit local needs has emphatically been vested in the local school boards.
>
> Thus "each common school district board of directors" is made "*accountable* for the proper operation of its district *to the local community and its electorate*."  To this end, each school board is "vested with the final responsibility for the setting of policies ensuring quality in the content and the extent of its educational program."

*Id.* at 477–78 (citations omitted) (emphases added); *see also id.* (noting the "disclosure and reporting provisions specifically designed to *ensure the board's 'accountability' to*

*the people of the community*" (emphasis added)).  It was only upon its consideration of the state statutory structure's vesting of decisionmaking in local and politically accountable school boards that the Court could conclude that "placing power over desgregative busing at the state level . . . restructured the Washington political process." *Id.* at 480.  Taking this into account, it is difficult to conclude that, in amending their state constitution to prohibit the use of racial preferences in university admissions, the people of Michigan modified "the community's *political mechanisms* . . . to place effective decisionmaking authority over a racial issue at another level of *government*." *Id.* at 474 (emphases added).  Michigan has not "'burden[ed] all future attempts' to implement race-conscious admissions policies 'by lodging decisionmaking authority over the question at a new and remote level of government.'"  (Maj. Op. at 30–31 (quoting *Seattle*, 458 U.S. at 483).)  Having little or no direct or indirect influence on the bodies that actually set admissions standards—the faculty committees—the people of Michigan made a political change at the *only* level of government actually available to them as voters.  The Michigan electorate, therefore, as opposed to choosing a more complex structure for lawmaking, employed *the one* effective method available to exert electoral pressure on the mechanisms of government.

In short, Michigan has chosen to structure its university system such that politics plays no part in university admissions at all levels within its constitutionally created universities.  The Michigan voters have therefore not restructured the political process in their state by amending their state constitution; they have merely employed it.

## IV.

Finally, it is plain that Proposal 2 does not violate the Equal Protection Clause under a traditional approach to equal protection.  "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976).  We apply strict scrutiny to laws that (1) include a facial racial classification or (2) have a discriminatory impact and a discriminatory purpose. *Adarand*, 515 U.S. at 227; *Davis*,

426 U.S. at 239–42. Proposal 2, which prohibits racial classifications, *a fortiori* does not classify facially on the basis of race. *See Wilson*, 122 F.3d at 702; *Coral Constr.*, 235 P.3d at 957. As to discriminatory impact and purpose, the district court did find "sufficient evidence to establish a fact question on the disparate impact part of the test" but found no discriminatory purpose. *Coal. to Defend Affirmative Action*, 539 F. Supp. 2d at 951–52. Indeed, it stated that "the demonstration of a discriminatory purpose . . . dooms [the] conventional equal protection argument" because it "cannot [be] sa[id] that the only purpose of Proposal 2 is to discriminate against minorities." *Id.* (citing various motivations of Proposal 2's chief supporters that were not racially discriminatory). The district court's conclusions are correct. "[A]bsent a referendum that facially discriminates racially, or one where although facially neutral, the only possible rationale is racially motivated, a district court cannot inquire into the electorate's motivations in an equal protection clause context." *Arthur v. Toledo*, 782 F.2d 565, 574 (6th Cir. 1986). Thus, no heightened level of scrutiny need be applied to Proposal 2, and under rational basis review, Proposal 2 is easily justifiable. Proposal 2 does not violate the Equal Protection Clause under the conventional analysis. *See Brown*, 674 F.3d at 1135; *Wilson*, 122 F.3d at 701; *Coral Constr.*, 235 P.3d at 957.

## V.

As a last matter, I have no disagreement with the majority's treatment of the procedural issues discussed in Part II.B and C.

## VI.

For these reasons, I would conclude that Proposal 2 does not violate the Equal Protection Clause of the United States Constitution under either a political restructuring theory or traditional theory of equal protection. Accordingly, I would affirm the judgment of the district court.

_____

**DISSENT**

_____

ROGERS, Circuit Judge, dissenting.  I join Judge Gibbons's compelling dissent.

Under the majority opinion, it is hard to see how any level of state government that has a subordinate level can pass a no-race-preference regulation, ordinance, or law. Doing so would perforce make it harder for one minority or another to obtain a preference at the lower level.  That alone can hardly render the no-race-preference act unconstitutional.  Whatever *Hunter* and *Seattle* hold, the Supreme Court cannot have intended such a ban.

_____

**DISSENT**

_____

SUTTON, Circuit Judge, dissenting.  I join Judge Gibbons' dissent and write separately to make a few additional points.

Today's lawsuit transforms a potential virtue of affirmative action into a vice. If there is one feature of affirmative-action programs that favors their constitutionality, it is that they grow out of the democratic process:  the choice of a majority of a State's residents to create race-conscious admissions preferences at their public universities not to benefit a majority race but to facilitate the educational opportunities of disadvantaged racial minorities.  Such democratically enacted programs, like all democratically enacted laws, deserve initial respect in the courts, whether the particulars of a program satisfy the Fourteenth Amendment, *see Grutter v. Bollinger*, 539 U.S. 306, 343 (2003), or violate it, *see Gratz v. Bollinger*, 539 U.S. 244, 275–76 (2003).

Yet this lawsuit turns these assumptions on their head.  Democracy, it turns out, has nothing to do with it.  Plaintiffs insist that the Fourteenth Amendment's guarantee of "equal protection of the laws" imposes two new rules on the policy debates surrounding affirmative action in higher education.  Rule one:  States not only *may* establish race-conscious affirmative-action programs, but they *must* do so to comply with the Fourteenth Amendment.  Rule two:  even if the Fourteenth Amendment does not mandate that States establish affirmative-action programs at their public universities, it bars them from eliminating such programs through amendments to their constitutions.

A.

The first theory has little to recommend it, so little that the notion of mandatory affirmative action will come as a surprise to all Justices of the United States Supreme Court, past and present, who have labored to determine *whether* state universities may *ever* enact such race-conscious programs under the United States Constitution.  No Justice has taken the position that this recurring and vexing debate has all been a

distraction, one that overlooked the hidden truth that the Fourteenth Amendment necessarily permits affirmative-action programs because it demands them.

Plaintiffs nonetheless insist that, "to the extent that [Proposal 2] . . . bar[s] race or gender conscious programs that would be permissible under the Fourteenth Amendment, it violates the Equal Protection Clause." Coalition First Br. at 39; *see also, e.g.*, Oral Arg. at 7:36–45. Yet the words of the one amendment (prohibiting the State from "discriminat[ing] . . . on the basis of race") cannot violate the words of the other ("nor shall any State deny to any person . . . the equal protection of the laws").

That is especially true in the context of classifications based on race, which are presumptively unconstitutional and which must run the gauntlet of strict scrutiny to survive. *See Gratz*, 539 U.S. at 270. If racial preferences are only occasionally and barely constitutional, it cannot be the case that they are always required. A State that wishes to treat citizens of all races and nationalities equally "is free as a matter of its own law" to do so. *Oregon v. Hass*, 420 U.S. 714, 719 (1975). A first premise for resolving this case is, and must be, that a State does not deny equal treatment by mandating it.

B.

The claimants' other theory is of a piece. Having argued that the people of Michigan may not resort to the political process to eliminate racial preferences because the Fourteenth Amendment demands them, the claimants alternatively insist that the "political process doctrine" of the Fourteenth Amendment separately prohibits the State from eliminating such programs already in existence by way of a state constitutional amendment. Coalition First Br. at 27. That is not much of an alternative, as it comes to the same end. More fundamentally, the argument misapprehends what States may do as a matter of "politics" *and* "process." Under the realm of politics, as just shown, the people of a State may choose to end rather than continue affirmative-action programs. Under the realm of process, the people of a State are free to use amendments to their constitution—the same charter of state government that delegated power to create affirmative-action programs in the first place—as the vehicle for making the change.

It is not that easy, plaintiffs insist. Even if States may do all of these things, the political-process doctrine prohibits States from altering their constitutions in a way that places "special burden[s] on racial minorities within the governmental process." *Hunter v. Erickson*, 393 U.S. 385, 391 (1969); *see* Coalition First Br. at 28. Yes, of course. But Michigan did no such thing.

By any reasonable measure, Proposal 2 does not place "special burdens" on racial minorities. It bans "discriminat[ing] against, or grant[ing] preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." Mich. Const. art. I, § 26. That is not a natural way to impose race-based burdens. The words of the amendment place no burden on anyone, and indeed are designed to prohibit the State from burdening one racial group relative to another. All of this furthers the objectives of the Fourteenth Amendment, the same seed from which the political-process doctrine sprouted.

That the people of Michigan made this change through their Constitution, as opposed to state legislation or a new policy embraced by the governing boards at the three state universities, does not impose a "special burden" on any racial minority. There is nothing unusual about placing an equal-protection guarantee in a constitution. That is where individual-liberty guarantees often go, and that after all is where the national framers placed the federal counterpart. States need not place equal-protection guarantees at the structural location of the plaintiffs' choosing, be it at the governing boards of each university, the faculty of each university or the admissions office of each university. Instead of neutralizing the political process, that approach would skew it.

What else at any rate could the people of Michigan have done? Keep in mind that Proposal 2 applies not just to "public education" but also to "public employment" and to "public contracting." Neither the governing boards of the universities nor the universities' faculties nor for that matter each university's admissions committee oversees "public employment" or "public contracting" for the entire State. And the

Michigan Constitution prohibits the legislature from interfering in "the university's sphere of educational authority." *Federated Publ'ns, Inc. v. Bd. of Trustees of Mich. State Univ.*, 594 N.W.2d 491, 497 (Mich. 1999). That left the State just one option for addressing racial preferences in all three areas: a statewide constitutional amendment. This time-hallowed option places no special burden on proponents of affirmative action other than the customary burdens placed on *anyone* seeking to pass a constitutional amendment.

The charge that the Federal Constitution prohibits States from banning racial preferences through amendments to their constitutions also fails to account for one of the most fervent criticisms of state constitutions: They are *too easy* to change. The referendum option *facilitates* change, as it makes altering the constitution as easy as (if not easier than) altering legislation. After obtaining the requisite number of signatures (10% of the votes cast in the last gubernatorial election, *see* Mich. Const. art. XII, § 2), the proponents of change need to obtain just 51% of a popular vote and are spared the need to obtain the consent of the Governor and each house of the legislature. That is why the former Chief Justice of the California Supreme Court, faced with an equally variable state constitution, decries the "perpetual instability of California's state constitutional law." *See* Ronald M. George, *Keynote Address*, 62 Stan. L. Rev. 1515, 1516 (2010).

Nothing prevents proponents of affirmative action from borrowing a page from the same playbook in a future state referendum—unless, that is, 51% of Michigan voters do not support the change. But if the caveat applies, the answer is not to resort to the political-process doctrine, the goal of which is to promote neutral democratic means and ends, not to ban them. The short of it is that a bare requirement of a 51% popular vote as a vehicle for constitutional change is as good as it gets—at least from the perspective of proponents of future change. States may create higher, super-majority impediments to change. But they cannot create *super-minority* facilitations of it.

Of the 51 constitutions in this country, moreover, the most difficult to change is the Federal Constitution, which requires three-quarters of the States to ratify an amendment. Now *that* is a difficult charter to change. Is it really possible that the same Federal Constitution that is nearly impervious to change precludes a State from housing its elimination of racial preferences in a constitution that requires just a 51% popular vote for passage? Doubtful.

Odder still, the United States Constitution generally does not meddle in the way the States structure their governments. *Sailors v. Bd. of Educ. of Kent Cnty.*, 387 U.S. 105, 109 (1967). If they want a unicameral legislature, they can have it. *See* Neb. Const. art. III, § 1. And if they want direct democracy through constitutional and legislative referenda, they can have it. *Pac. States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118, 151 (1912). If even the "republican form of government" guarantee is unenforceable, *see* U.S. Const. art. IV, § 4; *Luther v. Borden*, 48 U.S. (7 How.) 1, 42 (1849), it is surely the case that the Fourteenth Amendment does not dictate the level of government at which a State must enact a statewide ban on race discrimination.

It is worth considering plaintiffs' alternative to this straightforward interpretation of the Fourteenth Amendment, the one every other court to face this issue has embraced, including our own when the plaintiffs sought to prevent Proposal 2 from going into effect in 2007. *See Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d 237, 250 (6th Cir. 2006); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 707 (9th Cir. 1997); *Coral Constr., Inc. v. City & Cnty. of San Francisco*, 235 P.3d 947, 960 (Cal. 2010). Instead of allowing the people of Michigan to end racial preferences through a statewide popular vote that amends the State Constitution, they insist the Fourteenth Amendment permits this change in one, and only one, way: multiple elections over multiple years. Their theory contains several premises and several steps. One: any change may not come through legislation because the Michigan Constitution puts the governing boards at each of the three public universities (Michigan, Michigan State and Wayne State) in charge of educational policy, including apparently admissions policies, at each university. Two: there are eight members of the Board at each university, and two of

them stand for election every two years in statewide elections.  Three:  these statewide elections are the only neutral way to permit opponents of racial preferences to establish such an admissions policy.  Four:  after eight years, the opponents of racial preferences will have had a chance to replace all members of the three Boards and presumably by then, if not a few years before, would have the votes to end racial preferences at each university.  And all of this explains only the rules for Michigan's three public universities.  Anyone wishing to change admissions policies at Michigan's *other* institutions of higher education faces an equally elaborate process.  *See* Mich. Const. art. VIII, § 6 (authorizing the elected governor to appoint members of regional university boards to staggered eight-year terms); *id*. § 7 (authorizing locally elected boards to regulate community and junior colleges).

Whatever else one might say about the path on which this interpretation of the Fourteenth Amendment takes us, it does not follow Occam's razor in getting there.  Yet needless complexity is the least of the problems raised by this theory.  How would the supporters of Proposal 2 end racial preferences in public contracting and public employment, which the university boards do not oversee?  Does plaintiffs' theory mean opponents of racial preferences must do both—win a statewide referendum *and* win twenty-four statewide individual elections?  Must proponents of affirmative action do the same to reverse a contrary policy?  Even if we ignore public contracting and employment, who says a single 10% petition drive and a single 51% popular vote make life more difficult for proponents of change than twenty-four statewide elections (among others) for twenty-four individuals over an eight-year period?  Where are the empirical studies to prove the point?  Should not the proponents of invalidating a state constitutional amendment be expected to prove the premise before the court accepts this invitation?  Could the supporters of Proposal 2 amend the Michigan Constitution to remove control of the universities from their governing boards and place it in the hands of the legislature?  What then?  Would statewide legislation banning (or reinstating) racial preferences be permissible?  There are many questions here, and all of them counsel against adopting this disfiguring interpretation of the Fourteenth Amendment.

I do not doubt that Proposal 2 places a burden on proponents of affirmative action: They no longer have access to it, and they must amend the constitution to get it back. But the Fourteenth Amendment insists only that all participants in the debate have an equal shot. It does not ensure victory for one side or the other in this or that policy debate. It would be paradoxical if something called the "political process doctrine" insulated one side of a vigorous policy debate from a timeless rule of politics: win some, lose some. Winning some and losing some, as it happens, is just what has occurred across the country with statewide ballots seeking to eliminate racial preferences. While some initiatives have prevailed (California, Michigan, Nebraska and Washington), others have failed (Colorado, Missouri and Oklahoma). *See* Tim Hoover, *Amendment 46 Fizzling Out*, Denver Post, Nov. 7, 2008 at B4.

Another oddity of this theory is that it would apply even if the Michigan Constitution eliminated affirmative-action programs in another way. In 1963, the people of Michigan passed an earlier amendment to their Constitution, one that prohibited race discrimination by governmental entities. *See* Mich. Const. art. I, § 2. In view of this prohibition, a Michigan resident surely would have the right to bring a claim that the State Constitution's existing prohibition on race-based classifications bars a system of racial preferences in admissions, contracting and employment. If there is one thing that the closely divided decisions in *Bakke*, *Gratz* and *Grutter* illustrate, it is that the Michigan Supreme Court could reasonably invalidate, or reasonably uphold, racial preferences under the State Constitution's existing equal-protection guarantee. A decision invalidating racial preferences, however, would have precisely the same effect as Proposal 2, establishing that the Constitution bars racial preferences and placing the onus on proponents of racial preferences to alter the Constitution. The claimants have no answer to this point. If Proposal 2 violates the political-process doctrine, so too would a decision by the Michigan Supreme Court that comes to the same end through a permissible interpretation of the 1963 equal-protection guarantee.

The same is true of a state court's decision to apply strict scrutiny to racial preferences. Most state constitutions, including all of the ones in our circuit, mirror this

aspect of the Federal Constitution:  They require strict scrutiny of governmental classifications based on race.  *See, e.g.*, *D.F. v. Codell*, 127 S.W.3d 571, 575 (Ky. 2003); *Harvey v. State, Dep't of Mgmt. & Budget, Bureau of Retirement Servs.*, 664 N.W.2d 767, 770 (Mich. 2003); *State v. Thompson*, 767 N.E.2d 251, 255–56 (Ohio 2002); *State v. Tester*, 879 S.W.2d 823, 828 (Tenn. 1994).  One might think these constitutional safeguards would be secure from second-guessing by federal courts, but they are not under plaintiffs' theory.  For they impose special burdens on some policies that might benefit racial minorities in the admissions process without imposing the same burdens on policies that benefit groups categorized along non-suspect lines, such as children of alumni, athletes or band members.  Under each of these state constitutions, a member of a racial minority who wants a governmental privilege must identify a compelling state interest that supports its provision.  If plaintiffs are correct, that reality dooms the States' equal protection clauses, even though the federal Equal Protection Clause requires no less.  That cannot be right.

The Court's decision in *Romer v. Evans*, 517 U.S. 620 (1996), which did not concern racial classifications, holds nothing to the contrary.  Colorado enacted a constitutional amendment prohibiting the State and its municipalities from enacting laws banning discrimination on the basis of "homosexual, lesbian or bisexual orientation, conduct, practices or relationships."  *Id.* at 624.  In invalidating the amendment, the Court noted that the amendment "impos[es] a broad and undifferentiated disability" (the inability to seek protection from discrimination at the state or local level) "on a single named group" (gays and lesbians).  *Id.* at 632.  The amendment "was inexplicable by anything but animus toward the class it affects" and therefore "lack[ed] a rational relationship to legitimate state interests."  *Id.*  By contrast, Proposal 2 serves a rational interest, indeed a compelling one:  eliminating racial classifications in admissions, public employment and public contracting.

The Court's decisions in *Hunter* and *Seattle*, which did concern racial classifications, also hold nothing to the contrary.  The laws invalidated in both cases were designed to disadvantage one minority group—African-Americans—and no other.

In *Hunter*, the City of Akron in 1964 amended its charter to require that any housing ordinance forbidding discrimination "on the basis of race, color, religion, national origin or ancestry" be approved in a city-wide referendum before going into effect, an amendment designed to hinder only the political goals of the African-American community. *See* 393 U.S. at 391; *id.* at 394, 395 (Harlan, J., concurring). In *Seattle*, the State of Washington in 1978 enacted a law forbidding school districts from requiring children to be bused to schools distant from their homes, but made exceptions for busing designed for virtually every purpose *except* racial integration. 458 U.S. at 462–63. It thus "remove[d] the authority to address a racial problem—and only a racial problem—from [school boards]." *Id.* at 474.

The same cannot be said of Proposal 2. In the first place, Proposal 2 removes racial preferences, not anti-discrimination measures. To the extent Proposal 2 has any effect on the political structures through which a group may acquire special treatment in university admissions, it is a leveling one. The law imposes no "special burden[s]" on anyone, *Hunter*, 393 U.S. at 391, but instead eliminates "pernicious" "racial classifications," *Gratz*, 539 U.S. at 270. If ever there were a neutral, non-special burden, that is it. The Equal Protection Clause freely permits governments to ban racial discrimination, as here, but it does not freely permit them to ban all bans on racial discrimination, as in *Hunter* and *Seattle*.

In the second place, Proposal 2 prohibits discrimination not just on the basis of race but also on the basis of sex, ethnicity and national origin. To the extent it disadvantages anyone, it disadvantages groups that together account for a majority of Michigan's population, not this or that racial minority. It "make[s] little sense to apply 'political structure' equal protection principles where the group alleged to face special political burdens itself constitutes a majority of the electorate." *Coal. for Econ. Equity*, 122 F.3d at 704.

Nor is it even clear which groups—men or women, this racial group or that one—Proposal 2 helps and hurts, or when each group will be affected. Perhaps there

was a time when a ban on gender-based preferences favored men.  Perhaps the opposite is true today, as female high school students increasingly outperform their male classmates.  *See, e.g.*, Rob Mank, *Men Far More Likely to Benefit from Affirmative Action in College Admissions*, CBS News, Sept. 26, 2011, http://www.cbsnews.com/8301-503544_162-20111646-503544.html.  A ban on racial preferences likewise may favor some racial groups today and others tomorrow.  The one thing we know for sure is that race-based programs need not, indeed may not, last into perpetuity, as the Court assumed that *all* such programs would come to an end within 25 years—namely by 2028.  *See Grutter*, 539 U.S. at 343.  It is the essence of democracy to allow the people to use their own judgment in deciding when a complicated policy has outlived its usefulness, and nothing in *Grutter* required the States to wait until 2028 to make that choice.

It is no answer to say that Michigan may adopt a statewide policy regarding racial preferences if, and only if, they adopt statewide policies on other admissions policies—from how much weight to give Advanced Placement courses to how many zoology students to admit to how to treat children of alumni to how to treat football players, oboists or thespians.  The Equal Protection Clause reflects our collective judgment that generalizations based on race are dubious in the near term and destructive in the long term, making it appropriate to treat racial proxies, which are presumptively unconstitutional, differently from other more-pedestrian distinctions, which are presumptively constitutional.  *Gratz*, 539 U.S. at 270.  It does not bar Michigan from recognizing the same.

Any doubt that *Hunter* and *Seattle* support rather than undermine the constitutionality of Proposal 2 is removed by *Seattle*, the last of the two decisions.  In *Seattle*, Justice Powell, no stranger to affirmative-action debates, raised the concern that the majority's reasoning meant that, "if the admissions committee of a state law school developed an affirmative-action plan that came under fire, the Court apparently would find it unconstitutional for any higher authority to intervene unless that authority traditionally dictated admissions policies." 458 U.S. at 499 n.14 (Powell, J., dissenting).

No worries, the majority responded:  The problem with Washington's anti-busing initiative was "the burden it impose[d] on minority participation in the political process," *id.* at 480 n.23, a consideration that made Justice Powell's hypothetical "entirely unrelated to this case" because it had "nothing to do with the ability of minorities to participate in the process of self-government." *Id.*  If the Court thought that the removal of an affirmative-action policy was "entirely unrelated" to the concerns in *Seattle*, then I am hard-pressed to understand why the same is not true in this instance—and just as hard-pressed to understand how anyone can insist our hands are tied in today's case. The companion political-process case to *Seattle*, handed down the same day, confirmed the point.  The "Equal Protection Clause," it made clear, "is not violated by the mere repeal of race-related legislation or policies that were not required by the Federal Constitution in the first place." *Crawford v. Bd. of Educ. of Los Angeles*, 458 U.S. 527, 538–39 (1982).  That is all that happened here.  The majority seeing it differently, I respectfully dissent.

———————

**DISSENT**

———————

GRIFFIN, Circuit Judge, dissenting.  Today's decision is the antithesis of the Equal Protection Clause of the Fourteenth Amendment.  The post-Civil War amendment that guarantees equal protection to persons of all races has now been construed as barring a state from prohibiting discrimination on the basis of race.  As the United States Supreme Court has observed, "[i]t would be paradoxical to conclude that by adopting the Equal Protection Clause of the Fourteenth Amendment, the voters of the State thereby had violated it." *Crawford v. Bd. of Educ.*, 458 U.S. 527, 535 (1982).  Yet the majority has effectively so concluded in striking down a portion of Michigan's Proposal 2 (MICH. CONST. art. I, § 26 ).  I join Judge Gibbons' dissent, except for Section III, and write separately to emphasize that the "political structure" doctrine is an anomaly incompatible with the Equal Protection Clause.  I urge the Supreme Court to consign this misguided doctrine to the annals of judicial history.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. 14, § 1.  Under its application, a state law is subject to strict scrutiny when it explicitly distinguishes between individuals on the basis of race. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 279–80 (1986) (plurality opinion); *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *McLaughlin v. Florida*, 379 U.S. 184, 191–92 (1964).  Such express racial classifications are suspect because, "[a]bsent searching judicial inquiry[,] . . . there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality opinion); *see also id.* at 520 (Scalia, J., concurring in judgment).

Facially neutral laws, on the other hand, warrant strict scrutiny only if they are "motivated by a racial purpose or object," *Miller v. Johnson*, 515 U.S. 900, 913 (1995),

or are "'unexplainable on grounds other than race.'" *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also Washington v. Davis*, 426 U.S. 229, 242 (1976) ("Standing alone, . . . [disproportionate impact on a racial minority] does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations.") (internal citation omitted).

The ill-advised "political structure" doctrine employed by the majority in this case was crafted by the Supreme Court more than one hundred years after the ratification of the Fourteenth Amendment. Before today, the cases fitting its mold numbered three: *Hunter v. Erickson*, 393 U.S. 385 (1969); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982); and *Lee v. Nyquist*, 318 F. Supp. 710 (W.D. N.Y. 1970) (three-judge court), *summarily aff'd*, 402 U.S. 935 (1971). The infrequent use of the doctrine is not surprising given its lack of a constitutional basis. It replaces actual evidence of racial motivation with a judicial presumption and, hence, is an aberration inconsistent with the Fourteenth Amendment.

The laws at issue in *Hunter* and *Seattle* were both facially neutral. *See Hunter*, 393 U.S. at 391 (noting that "the law on its face treats Negro and white, Jew and gentile in an identical manner"); *Seattle*, 458 U.S. at 471 (referring to the "facial neutrality" of the state legislation). Yet, in each case, the Supreme Court held that strict scrutiny applied without any need for the respective plaintiffs to show that the laws were enacted as a result of discriminatory intent or were inexplicable on grounds other than race. It simply declared that there was an "'explicitly racial classification'" where the prior law inured to the benefit of racial minorities, and the newly enacted law moved the applicable decisionmaking process to a more remote level of government. *Seattle*, 458 U.S. at 468 (quoting *Hunter*, 393 U.S. at 389).

These decisions are justifiably characterized as "jurisprudential enigmas that seem to lack any coherent relationship to constitutional doctrine as a whole." David J. Baron, *The Promise of Cooley's Cities: Traces of Local Constitutionalism*, 147 U. Pa.

L. Rev. 487, 561 (1999); *see also* Daniel P. Tokaji, *First Amendment Equal Protection: On Discretion, Inequality, and Participation*, 101 Mich. L. Rev. 2409, 2476 (2003) ("It is therefore easy to view these cases as constitutional oddballs, difficult or impossible to explain in light of accepted equal protection principles."). "In the absence of a federal constitutional violation requiring race-specific remedies, a policy of strict racial neutrality by a State . . . violate[s] no federal constitutional principle." *Seattle*, 458 U.S. at 491 (Powell, J., dissenting).

Moreover, as first noted by Justice Powell, the political structure doctrine unconstitutionally suspends our normal and necessary democratic process by prohibiting change when a lower level of state government has acted in a way that arguably benefits racial minorities. *Id.* at 494–96 (Powell, J., dissenting) ("The political process in Washington, as in other States, permits persons who are dissatisfied at a local level to appeal to the state legislature or the people of the State for redress," but "[u]nder today's decision this heretofore undoubted supreme authority of a State's electorate is to be curtailed whenever a school board—or indeed any other state board or local instrumentality—adopts a race-specific program that arguably benefits racial minorities.").

In addition, the majority in the present case eschews a "traditional" Equal Protection Clause analysis by deeming its well-established principles unnecessary to the legal equation. I respectfully disagree and would hold that by conventional equal protection standards, Proposal 2 passes constitutional muster. "A law that prohibits the State from classifying individuals by race or gender *a fortiori* does not classify individuals by race or gender." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir. 1997). In my view, racial discrimination and racial preference are synonymous. In the realm of a finite number of classroom seats, the preference given one person based upon his race is the discrimination inflicted upon another based upon his. Discrimination on the basis of race is racial discrimination, whether it is euphemistically called a "preference" or something else. In affirming California's substantially similar

Proposition 209, which banned race and gender preferences, the Ninth Circuit in *Wilson*

eloquently stated:

> When the government prefers individuals on account of their race or gender, it correspondingly disadvantages individuals who fortuitously belong to another race or to the other gender. "Consistency *does* recognize that any individual suffers an injury when he or she is disadvantaged by the government because of his or her race." *Adarand*, 515 U.S. at 230, 115 S. Ct. at 2114. Proposition 209 amends the California Constitution simply to prohibit state discrimination against or preferential treatment to any person on account of race or gender. Plaintiffs charge that this ban on unequal treatment denies members of certain races and one gender equal protection of the laws. If merely stating this alleged equal protection violation does not suffice to refute it, the central tenet of the Equal Protection Clause teeters on the brink of incoherence.

*Wilson*, 122 F.3d at 702; *cf. Coal. to Defend Affirmative Action v. Granholm*, 473 F.3d

237, 250 (6th Cir. 2006) ("If the Equal Protection Clause gives heightened scrutiny to

[gender-based classifications], a State acts well within the letter and spirit of the Clause

when it eliminates the risk of any such scrutiny by removing gender classifications

altogether in its admissions programs.") (internal quotation marks omitted).

In a footnote, the majority superficially acknowledges, but does not discuss, the

circuit split it creates in declining to follow the Ninth Circuit decisions upholding the

constitutionality of analogous Proposition 209. *See Wilson* and *Coal. to Defend*

*Affirmative Action v. Brown*, 674 F.3d 1128 (9th Cir. 2012). I would adopt the

persuasive reasoning of *Wilson* and hold that, in amending their state constitution to

prohibit racial discrimination and "preferential treatment," the citizens of Michigan did

not violate the Equal Protection Clause of the Fourteenth Amendment, but rather

enshrined its principles into the Michigan Constitution. Like Proposition 209,

Michigan's proscription of racial preference, "as a matter of law and logic, does not

violate the Equal Protection Clause in any conventional sense." *Wilson*, 122 F.3d at 702.

Finally, in an effort to avoid confusion and aid further review, I note the limits of the majority's holding. My colleagues do *not* declare MICH. CONST. art. I, § 26 unconstitutional in its entirety. Rather, their holding is limited to "racial minorities" and our court's declaration "[f]inding those provisions of Proposal 2 affecting Michigan's public colleges and universities unconstitutional . . . ." Thus, the other provisions of MICH. CONST. art. I, § 26 that prohibit discrimination and preferential treatment on the basis of sex, ethnicity, or national origin in the operation of public employment, public education, and public contracting, survive this court's ruling. Further, the Michigan constitutional prohibitions against discrimination or preferential treatment based on race, except in the operation of public colleges and universities regarding "racial minorities," remain in effect. In this regard, art I, § 26(7) contains a severability clause: "Any provision held invalid shall be severable from the remaining portions of this section."

I caution that because the term "racial minorities" is not defined by the majority opinion, the class of persons benefitting from it is unclear and will be a potent source of litigation were it allowed to stand. Under today's en banc decision, not all persons are entitled to the equal protection of the laws.

For these reasons, I would affirm the district court and therefore respectfully dissent.